UNITED STATES of America

v.

Steven VENTO, Appellant in 74–1845, et al.

Appeal of Adrian MASTRANGELO, in 74–1850.

Appeal of Robert J. MENGINI, in 74–1887.

Appeal of Victor DeLUCA in 74–1945.

Nos. 74–1845, 74–1850, 74–1887 and 74–1945.

United States Court of Appeals, Third Circuit.

Argued Nov. 20, 1975.

Reargued Jan. 14, 1976.

Decided March 16, 1976.

As Amended April 7, 1976.

---

Robert E. J. Curran, U. S. Atty., David J. McKeon, Special Atty., Philadelphia, Pa., Shirley Baccus-Lobel, Kenneth G. Spillias, Attys., Dept. of Justice, Washington, D.C., for appellee.

A. Charles Peruto, Philadelphia, Pa., for appellant Vento.

Edward Reif, Philadelphia, Pa., for appellant Mengini.

Stanford Shmukler, Philadelphia, Pa., for appellant Mastrangelo.

Vincent J. Ziccardi, Philadelphia, Pa., for appellant DeLuca.

Before VAN DUSEN, ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The wiretap provisions in Title III of the Omnibus Crime Control Act create a tension between the efficient pursuit of organized crime and the right of privacy. Title III obliges the courts to measure the permissible use of sophisticated electronic investigative tools against the specific restraints imposed by Congress to avoid undue intrusions upon privacy. This balancing process has engendered a growing literature on the law of electronic eavesdropping. Our decision represents another gloss on that text.

The prosecution of the defendants in this alleged conspiracy to distribute methamphetamine depended in large measure upon evidence from intercepted telephone conversations. Defendants claim that the gathering and use of such evidence against them was infested with error and that it was consequently inadmissible at the trial.[1]

---

1. Defendant Mastrangelo asserts, in addition, that there was insufficient evidence to connect him with any of the conversations that were intercepted. See text accompanying notes 84–90 infra.

Besides protesting the use of evidence obtained by wire intercept, defendants also charge that the search of defendant DeLuca's car without a warrant was improper, and that the evidence obtained in that search was inadmissible against at least De-Luca and Vento. Two of the defendants urge that there was insufficient evidence to connect them to the general conspiracy and that, therefore, the intercepted statements of their alleged co-conspirators should not have been employed against them. All contend that their convictions were fatally marred because they were denied an opportunity to question jurors about possible prejudice as a result of the supposedly hostile connection between an alternate juror and defendant Vento. Finally, the indictment itself is claimed to be defective for describing methamphetamine as "a Schedule II controlled substance," pursuant to an amendment of the schedules by the Attorney General, whereas the statute as enacted by Congress placed methamphetamine in schedule III.

## FACTUAL BACKGROUND

Although the Justice Department had some prior interest in the alleged narcotics activities of Steven Vento, the central figure in this litigation, a serendipitous discovery led to the convictions before us. On June 20, 1973, the Philadelphia Strike Force of the Department of Justice applied to Judge Hannum for an order authorizing the installation of a pen register [2] on the telephone line of Nicholas Gregorio and the interception of conversations over that line. The affidavit accompanying the application contained information that formed the basis for believing that Gregorio and "others yet unknown" were engaged in theft and possession of goods stolen from interstate shipment. The Gregorio wiretap was to further the investigation of these crimes. Judge

Hannum authorized the pen register and the wiretap, both to continue for fifteen days or until the accomplishment of the objectives set forth in the application, whichever was earlier. The district court also ordered that reports be submitted on the fifth and tenth days of the surveillance. Tapping of the Gregorio telephone began on June 21, and ended on July 2, the twelfth day. Reports were submitted to Judge Hannum on June 25 and June 29.

The Gregorio wiretap furnished the Strike Force with information that led to the indictment of Gregorio for theft of interstate shipment, but it also resulted in the interception of conversations respecting dealings in controlled substances. The conversations regarding controlled substances were relayed by the F.B.I. to the Drug Enforcement Administration (DEA). At the conclusion of the Gregorio surveillance a warrant for the search of his premises was obtained. While this search did not produce any evidence of value to a prosecution for theft from interstate shipment, the searchers did discover six ounces of methamphetamine in Gregorio's house.

Employing intercepted conversations from the Gregorio wiretap, as well as information obtained from DEA agents and informants, the Strike Force then applied to Judge Newcomer for a wiretap on a telephone located in the home of, and allegedly used by, Vento. In connection with this application, the material from the Gregorio wiretap was utilized without first securing permission from Judge Hannum for its disclosure.

Judge Newcomer authorized a wiretap and the use of a pen register on Vento's telephone line on July 12, 1973, and the monitoring began the same day. A five-day report, though not required by the terms of the order, was submitted on July

---

**2.** A pen register is a device attached to a telephone line, usually at central telephone offices, that marks on a paper tape dashes equal to the number dialed. The paper tape thus constitutes a record of the numbers called on the particular line. The pen register if automatical-

ly disconnected before the line called has had an opportunity to answer. There is no recording or monitoring of the conversation. *See United States v. Guglielmo,* 245 F.Supp. 534, 535 (D.D.C.1965).

20. The eavesdropping terminated on July 27, but on August 2, at the request of the Strike Force, Judge Newcomer permitted a continuation of the Vento surveillance. The Vento interception lasted from August 2 until August 10, with an undated five-day report submitted at some point.

On the last day of the continued surveillance of Vento's communications, DeLuca was observed entering the Vento home empty-handed and then reappearing with a small brown paper bag. Wiretapped conversations indicated that DeLuca had gone to Vento's house to consummate a transaction in methamphetamine. After he left Vento's house, DeLuca's car was stopped and both he and it were searched. DEA agents discovered in DeLuca's car a paper bag containing several ounces of methamphetamine, worth approximately $16,800 "on the street."

A four-count indictment of the eight defendants, based in part on the Gregorio wiretap, was returned on November 7, 1973. On January 28, 1974, the Strike Force obtained a disclosure order from Judge Hannum to permit the use of the Gregorio wiretap evidence at trial. Subsequently this wiretap evidence was submitted to the grand jury and a supplemental nine-count indictment was returned on January 30, 1974. The eight defendants were charged with conspiring knowingly and intentionally to distribute quantities of methamphetamine, and with knowingly and intentionally using a communications facility, a telephone, to expedite distribution of a controlled substance. In addition, Vento, DeLuca, and Gregorio were charged with distribution and possession of methamphetamine. The original indictment was later dismissed at the request of the government.

Motions to suppress with respect to the Gregorio wiretap, the search of Gregorio's house, the Vento wiretap, and the search of DeLuca's car were all denied.

Trial before a jury began on June 7, 1974, with Judge Green presiding. The prosecution sought to establish a conspiracy to distribute methamphetamine. To this end, testimony concerning more than fifty telephone conversations was introduced by the government. Agents familiar with the voices on the tapes identified the participants, then agents conversant with the language of the narcotics trade interpreted each communication for the jurors. The government also produced evidence of the physical surveillance of the defendants and evidence obtained by the searches and seizures. On June 28, the alternate jurors were dismissed and the case was submitted to the jury. The jury returned a verdict convicting each defendant on all applicable counts.

Weeks after the trial ended, Vento and his lawyer learned that an alternate juror, Mrs. Elizabeth Bewley, might have possessed injurious information about Vento: Vento had been accused, but acquitted, of the murder of Reginald Cullen, who was the brother-in-law of Mrs. Bewley's brother. The defendants suspected that Mrs. Bewley had prejudiced some of the other jurors by conveying this tainted information to them. On July 31 a hearing was held to question Mrs. Bewley and Mrs. Bewley's nephew, Richard Costello, who was identified as the original source of the tip about Mrs. Bewley. After hearing their testimony, Judge Green denied a request by counsel for leave to interrogate the other jurors.

Of the eight defendants, only Vento, DeLuca, Mengini, and Mastrangelo perfected appeals.[2a] We affirm their convictions.

## WIRETAP EVIDENCE

At the heart of this prosecution is wiretap evidence. There is little reason to believe that the government could have obtained convictions here if the recorded conversations had not been introduced. The defendants object strenuously to almost all steps in the interceptions as well as to the use of the wiretapped conversations. Consideration of these objections requires us to join the continuing review conducted

---

**2a.** We note that Donald Woodruff, a/k/a "Chips," was tried separately and convicted. His conviction was affirmed by judgment order on March 16, 1976, —— F.2d —— (3d Cir. 1976).

by the federal courts of the procedures for authorization and use of wire interceptions.[3]

### A. Probable Cause for the Gregorio Interception

To obtain authorization for an interception of a wire communication, the government must show that:

(a) there is probable cause for belief that an individual is committing, has committed or is about to commit a particular offense enumerated in section 2516 [including theft from interstate shipment]

. . .

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception . . ..[4]

If the government's application did not present probable cause for the authorization of the interception, then the authorization and any surveillance pursuant to it were improper. And, if the surveillance was improper, the government could not use the fruits of that surveillance at trial or to further its investigation.[5] Thus, if the Gregorio tap was improvidently ordered, the government could not have obtained a proper authorization for the Vento interception—the source of the bulk of the evidence

used at trial. The defendants, therefore, seek first to preclude the government's use of wiretap evidence by alleging the absence of probable cause in the application for the Gregorio interception.

 The application relied on information from five unnamed persons and on the results of independent investigations that the government had made pursuant to two of the "tips." Insofar as the application rested upon informants to establish the central element of probable cause, it is to be tested by the standards enunciated in *Aguilar v. Texas* and *Spinelli v. United States*.[6] Affidavits accompanying the application must describe the circumstances which provide reason to believe that the unnamed informant is reliable and the basis for crediting the information about the particular criminal activity at issue.

Initial interest in Gregorio arose in connection with theft from interstate shipments, and all of the government's sources provided information about such activity. The first source related that Gregorio had received 200 cartons of stolen margarine. This information was confirmed by physical surveillance of Gregorio's premises and notice of the theft of a like amount of margarine from a railroad boxcar travelling in interstate commerce. Consequently, the

---

**3.** This Court has considered the provisions of Title III in *United States v. Armocida,* 515 F.2d 29 (3d Cir. 1975); *United States v. Armocida,* 515 F.2d 49 (3d Cir. 1975); *United States v. Acon,* 513 F.2d 513 (3d Cir. 1975); *United States v. Falcone,* 505 F.2d 478 (3d Cir. 1974); *United States v. Iannelli,* 477 F.2d 999 (3d Cir. 1974), aff'd, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *United States v. Whitaker,* 474 F.2d 1246 (3d Cir.), cert. denied, 412 U.S. 950, 93 S.Ct. 3003, 37 L.Ed.2d 1006 (1973); *United States v. Cafero,* 473 F.2d 489 (3d Cir. 1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974); *United States v. Ceraso,* 467 F.2d 647 (3d Cir.1972); *United States v. Eastman,* 465 F.2d 1057 (3d Cir. 1972); *In re Grand Jury Proceedings (Egan),* 450 F.2d 199 (3d Cir.), aff'd sub nom. Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972).

**4.** 18 U.S.C. § 2518(3) (1970). Section 2518(3)(d) provides that the government must show that:

there is probable cause for belief that the facilities from which, or the place where, the

wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

There is no averment that the government failed to sustain its burden with respect to subsection (3)(d).

**5.** 18 U.S.C. §§ 2515, 2518(10)(a)(i) (1970). *See United States v. Giordano,* 416 U.S. 505, 524–29, 94 S.Ct. 1820, 1831, 40 L.Ed.2d 341, 360 (1974); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319, 321 (1920).

**6.** *Aguilar,* 378 U.S. 108, 114, 84 S.Ct. 1509, 1513, 12 L.Ed.2d 723, 728 (1964); *Spinelli,* 393 U.S. 410, 415–416, 89 S.Ct. 584, 588, 21 L.Ed.2d 637, 643 (1969). *See United States v. Armocida,* 515 F.2d 29, 36 (3d Cir. 1975); *United States v. Falcone,* 505 F.2d 478, 481 (3d Cir. 1974); *United States v. McNally,* 473 F.2d 934 (3d Cir. 1973).

Strike Force's reliance was not on the informant himself, but upon its own investigation. A second source, whose information had been corroborated on at least three occasions, associated Gregorio with the receipt of merchandise stolen from Hennis Motor Lines. This lead, too, was checked by investigation; when subjected to interrogation, a suspect named by the informant said that he had sold the stolen merchandise to Gregorio.

Another informant, who had furnished reports leading to the arrest of three persons and the conviction of one, linked Gregorio to a theft of silver bars from a metal refining company and to the receipt of antique guns stolen from a private residence. This third source was able to supply detailed data about each crime. The connection between Gregorio and the theft of the silver bars was supported by still another informant, who over the years had given information leading to the arrest and conviction of four persons. His representation identified some of the participants in the theft and tied Gregorio to the receipt of the silver bars. A final source implicated Gregorio in the planning of a hijacking of an interstate shipment. Reports from this informer had previously led to the recovery of stolen merchandise, and his account of the planned hijacking was detailed.

■ The government's affidavit furnished an adequate basis to demonstrate the reliability of each source, although not every informant had previously provided information leading to convictions. Three of the sources had proven their credibility by giving information that led to arrests, convictions, or the recovery of stolen property. The other two had proven their dependability by subsequent investigations that confirmed the details of the intelligence they offered. Defendants protest that some of the informants cited in the application are criminals. We cannot share

their apprehension. Those with detailed information about the underworld are unlikely to be completely innocent, and the investigation of organized crime is rarely furthered by awaiting tips from respectable citizens.

There was also reason to credit the information that each informant furnished regarding Gregorio's hijacking activities. Either the information was confirmed by investigation or else the report itself was sufficiently detailed to appear creditable.[7] This is not a case where the police have relied upon rumor or innuendo. The government's application for authorization to intercept Gregorio's conversations met the *Aguilar-Spinelli* test and supplied "probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516.[8]

■ The government's application also satisfied section 2518(3)(b) by offering "probable cause for belief that particular communications concerning that offense will be obtained through such interception." Two of the unnamed informants and one named informant indicated that Gregorio used his telephone to conduct transactions in stolen goods. Two of these persons provided the F.B.I. with independent verification of the number of the telephone that the F.B.I. sought to monitor.

B. *Exhaustion of Other Avenues of Investigation*

In addition to showing probable cause to believe "(a) . . . that an individual is committing . . . a particular offense" and "(b) . . . that particular communications concerning that offense will be obtained through such interceptions,"[9] the government must also establish that "(c) normal investigative procedures have been tried and have failed or reasonably appear

---

7. *Compare Spinelli,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637, *with Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) and *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

8. 18 U.S.C. § 2518(3)(a) (1970).

9. 18 U.S.C. § 2518(3)(a), (b) (1970).

to be unlikely to succeed if tried or to be too dangerous." [10]

Congress has established this additional precondition to obtaining a section 2518 authorization in order "to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications. These procedures [are] not to be routinely employed as the initial step in criminal investigation.[11] "[W]iretapping is not [to be] resorted to in situations where traditional investigative techniques would suffice to expose the crime." [12]

The government failed to establish, defendants maintain, that "normal investigative procedures" had been tried or appeared "unlikely to succeed." They suggest that the government should have subpoenaed the testimony of its informants and if necessary offered the informants immunity from prosecution. The defendants then propose that the government could have relied exclusively on the witnesses already available, that it could have conducted extensive physical surveillance, that Gregorio's co-conspirators were sufficiently known to establish a violation without further investigation, and that undercover agents should have been employed.

This argument, however, relies almost exclusively on the first clause of section 2518(3)(c)—"normal investigative procedures have been tried and have failed"—and ignores the disjunctive language of that provision—"or reasonably appear to be unlikely to succeed if tried or to be too dangerous." To adopt the defendants' contention in this respect would be to misapprehend the purposes of Congress in enacting this precondition to authorization of a wiretap.

In *United States v. Armocida*,[13] this Court, in accord with the legislative history, adopted a "pragmatic" approach to subsection (c). We held that the government's showing is to be "tested in a practical and commonsense fashion." [14] There is no requirement that every investigative methodology be exhausted prior to application for a section 2518 authorization.[15] Investigators are not obliged to try all theoretically possible approaches.[16] It is sufficient that the government show that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation. The government must, however, fully explain to the authorizing judge the basis for such a conclusion.[17]

Courts have declared that applications whose sole bases are general declarations and conclusory statements by the affiants will not support authorizations.[18] The use of "boiler plate" and the absence of particu-

10. 18 U.S.C. § 2518(3)(c) (1970).

11. *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341, 353 (1974).

12. *United States v. Kahn*, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 983, 39 L.Ed.2d 225 (1974).

13. 515 F.2d 29, 37–38 (3d Cir. 1975).

14. *See, e.g., In re Dunn*, 507 F.2d 195, 197 (1st Cir. 1974) (per curiam); *United States v. James*, 161 U.S.App.D.C. 88, 494 F.2d 1007, 1015–16, *cert. denied*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); S.Rep.No.1097, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2190 (hereinafter cited to U.S.Code Cong. & Admin. News).

15. *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974), *cert. denied*, 421 U.S. 909, 95

S.Ct. 1558, 43 L.Ed.2d 774 (1975); *United States v. Falcone*, 364 F.Supp. 877, 889 (E.D. Pa.1973), *aff'd*, 505 F.2d 478 (3d Cir. 1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 452 (1975).

16. 1968 U.S.Code Cong. & Admin.News, p. 2190. *See, e. g., Falcone*, 364 F.Supp. at 889; *United States v. Staino*, 358 F.Supp. 852, 856 (E.D.Pa.1973); *United States v. Whitaker*, 343 F.Supp. 358, 362–63 (E.D.Pa.1972), *rev'd on other grounds*, 474 F.2d 1246 (3d Cir.), *cert. denied*, 412 U.S. 950, 953, 93 S.Ct. 3003, 37 L.Ed.2d 1006 (1973).

17. *United States v. Curreri*, 388 F.Supp. 607, 620–21 (D.Md.1974).

18. *United States v. Kalustian*, 529 F.2d 585 (9th Cir. 1975); *Curreri*, 388 F.Supp. 618–21.

lars in requests for wiretap authorizations have not been permitted [19] lest wiretapping become established as a routine investigative recourse of law enforcement authorities, contrary to the restrictive intent of Congress. In granting motions to suppress, however, the courts have emphasized the government's failure to justify the applications; they have not insisted that the government exhaust all possible traditional investigative techniques prior to the applications.[20]

■ Here, the government made an adequate showing that other methods were unlikely to succeed. The anonymous informants categorically indicated that they would not testify against Gregorio. Prolonged physical surveillance of Gregorio's premises appeared impossible because Gregorio was reputed to be suspicious and had warned his neighbors to be on the alert for panel trucks and strangers in parked cars.

That the government's application did not mention the use of undercover agents, as defendants stress, is not controlling. In this situation an undercover agent would be incapable of providing the Strike Force with information about the full extent of the criminal operations unless placed in constant touch with Gregorio and his closest confederates: Undercover agents are not readily insinuated into a conspiracy, and may be exposed to unusual danger. The circumstances here do not require that the government justify its failure to plant a spy in the midst of Gregorio's enterprise. The application of the wiretap in this case comports with the directions of Title III.

■ Defendants, moreover, take an unreasonably narrow view of the scope of this investigation. Although normal investigative techniques might have been sufficient to implicate Gregorio in thefts from interstate shipment, such approaches could not show the scope of the conspiracy or the nature of Gregorio's on-going criminal activity. Investigations are not restricted to crimes which can be probed satisfactorily by normal methods. In the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies.[21] The government sought to know the full nature of Gregorio's schemes for theft from interstate shipment. That could be discovered only by learning from whom Gregorio was then purchasing stolen goods, and to whom he was then selling them, and the times and methods of those transactions. Witnesses who had past experience with Gregorio were necessarily of limited utility; prolonged physical surveillance was not possible; and search warrants would provide only a portion of the necessary information.

We conclude that the government's affidavit was sufficient to meet the preconditions for authorization of wire interception established in section 2518.

## C. *Minimization In The Gregorio Order*

The command of section 2518 that agents reduce intrusion on the communications of those subject to surveillance to the mini-

---

19. *See United States v. Kerrigan,* 514 F.2d 35, 38 (9th Cir. 1975) (per curiam), *petition for cert. filed,* 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249, 44 U.S.L.W. 3135 (U.S., June 20, 1975) (No. 74–1629). Courts have upheld authorizations based on applications that combine statements about general investigative experience in the type of crime and the particular facts of the case at hand. *See United States v. Schaefer,* 510 F.2d 1307, 1310 (8th Cir.), *cert. denied,* 421 U.S. 975, 978, 95 S.Ct. 1975, 1978, 44 L.Ed.2d 466, 468 (1975); *United States v. Brick,* 502 F.2d 219, 224 (8th Cir. 1974); *United States v. O'Neill,* 497 F.2d 1020, 1025 (6th Cir. 1974); *United States v. Bobo,* 477 F.2d 974, 982–83 (4th Cir. 1973), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1975).

20. *See Curreri,* 388 F.Supp. at 620. *Compare United States v. Turner,* 528 F.2d 143 (9th Cir. 1975), *with United States v. Kalustian,* 529 F.2d 585 (9th Cir. 1975).

21. *United States v. Armocida,* 515 F.2d at 38; *United States v. Robertson,* 504 F.2d 289, 293 (5th Cir. 1974), *cert. denied,* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975); *United States v. Pacheco,* 489 F.2d at 565; *United States v. Baynes,* 400 F.Supp. 285, 298–300 (E.D.Pa.1975), *appeal docketed,* No. 75–1435 et al., 3d Cir., Apr. 30, 1975.

mum level consistent with the authorization to investigate by wiretap is derived from the decision of the Supreme Court in *Berger v. New York*.[22] There the state wiretap statute was found deficient for failure to conform to the fourth amendment requirement that a warrant "particularly describ[e] the place to be searched, and the . . . things to be seized." This "particularization" was regarded as necessary in view of the broad invasion of privacy inherent in wiretapping, in order to avoid giving officers "a roving commission to 'seize' any and all conversations."

Judge Hannum's authorization for the Gregorio wiretap directed that it "shall be conducted in such a way as to minimize the interception under Chapter 119 of Title 18, United States Code, and must terminate upon attainment of the authorized objective or in any event, at the end of fifteen (15) days from the date of this order."[23] It also directed that the Strike Force report to the court "on or about the fifth and tenth days following the date of this order, or as often as the court may require, showing what progress has been made toward achievement of the authorized objective and the need for continued interception."[24]

Vento, Mengini, and DeLuca attack Judge Hannum's authorization as too broad, because it does not confine the interception to gathering evidence of culpability with respect to the crimes specified in the authorization, "the hijacking of interstate shipments, and the purchase and sale of goods stolen from an interstate shipment. . ." The order stipulated that:

> such interception shall not automatically terminate when the type of communications described above . . . has first been obtained, but shall continue until communications are intercepted which reveal the manner in which Nicholas Gregorio and others as yet unknown, participate in the conducting of the above-listed offenses, and which reveal the identity of their confederates, their places and manner of operation and the nature of the conspiracy involved therein, or for a period of fifteen (15) days from the date of this Order, whichever is earlier.

Because the directive does not offer the investigators detailed instructions on minimization of the interception of Gregorio's conversations, the defendants claim it permits a general search, condemned by *Berger v. New York,* and allows unbridled discretion in the agents.[25]

Once again, the defendants' argument rests upon a misconstruction of the purpose of the criminal investigation undertaken here. The minimization mandated by section 2518 does not compel agents to conclude their interceptions upon finding the minimum evidence necessary to show culpability. In addition, to the minimization requirement, section 2518 requires that

> [i]f the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of the facts establishing probable cause to believe that additional communications of the same type would occur thereafter [shall be included in the application]"[26]

Section 2518 also permits the authorizing judge to include in his order "a statement

---

**22.** 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). *See United States v. Cafero,* 473 F.2d 489 (3d Cir. 1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974). *See generally* Comment, *Post-Authorization Problems in the Use of Wiretaps,* 65 Cornell L.Rev. 92, 94–126 (1975).

**23.** *See* 18 U.S.C. § 2518(5) (1970).

**24.** *See* 18 U.S.C. § 2518(6) (1970). The Court of Appeals for the District of Columbia Circuit appears to require such reports in all autho-

rizations, although the statutory language is not mandatory in this regard. *United States v. Scott,* 170 U.S.App.D.C. 158, 516 F.2d 751, 759–60 (1975).

**25.** Defendants' reliance on *United States v. Vega,* 52 F.R.D. 503 (E.D.N.Y.1971), is inapposite. There the order failed for absence of proof that Vega used the intercepted telephone line in his narcotics business.

**26.** 18 U.S.C. § 2518(1)(d) (1970).

852

as to whether or not the interception shall automatically terminate when the described communication has been first obtained." [27] It has already been established that a wiretap may be used in investigating the scope and nature of a conspiracy and is not confined by section 2518(5) to the collection of minimal evidence of guilt of the party subject to the interception.

 Whether a particular order has made provision for appropriate minimization depends on an analysis of the circumstances of each case.[28] There is no doubt that Judge Hannum's order described the crime with particularity. To allow investigation of the entire pattern of the hijacking conspiracy was necessary to efficient law enforcement and was congruent with terms of the Act. Although the better practice may be to give detailed instructions in each order whenever practicable for minimization of unnecessary interceptions, it is not mandatory to give detailed instructions.[29] Accordingly, the order here is not insufficient because of the absence of such guidelines.

By enjoining termination of the interception upon attainment of its objective—the discovery of the nature and extent of the Gregorio hijacking conspiracy—Judge Hannum's authorization complied with the dictates of *United States v. Cafero*. Its terms were clear. "Executing officers [were] not free to intercept beyond attainment of their objective . . . ." [30]

There is no reason to hold that the authorization order for the Gregorio intercept was invalid as not providing for proper minimization.

D. *Minimization During the Gregorio Surveillance*

While conducting the Gregorio surveillance so as to discover the nature and ex-

tent of the hijacking conspiracy, government agents overheard at least thirty conversations implicating Vento in drug transactions. These conversations furnished the grounds for the application to tap Vento's telephone. Vento, Mengini, and DeLuca contend that these conversations fell outside the scope of Judge Hannum's authorization for the Gregorio tap. Although such conversations were reported to Judge Hannum in the five-day report, but not in the ten-day report, no additional authorization to intercept drug-related conversations was requested during the course of the Gregorio intercept. According to the defendants, the investigators' failure to minimize interception of conversations that lay beyond the scope of the authorized investigation constitutes an abuse that invalidates the entire surveillance.

 This aspect of minimization has been ably and fully discussed in *United States v. Armocida*,[31] and there is no need to rehearse that discussion here. Suffice it to say that the interception of conversations not related to Judge Hannum's authorization does not, without more, permit an inference of failure to minimize. As noted above, minimization is to be judged on a case-by-case basis, and *Armocida* directs attention to three aspects of each surveillance:

First, we are concerned with the nature and scope of the criminal enterprise under investigation. We recognize that where the criminal enterprise under investigation is a large-scale conspiracy, it may be necessary for the government to intercept more conversations than where the investigation is of a more limited criminal undertaking. This is especially so where, as here, the judicially approved wiretap is designed to identify other par-

**27.** 18 U.S.C. § 2518(4)(e) (1970).

**28.** *See United States v. Armocida*, 515 F.2d 25, 42–43 (3d Cir. 1975), and cases cited therein.

**29.** *See United States v. Fino*, 478 F.2d 35, 37 (2d Cir. 1973), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974).

**30.** 473 F.2d 489, 496 (3d Cir. 1973), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974).

**31.** 515 F.2d 29, 42–46 (3d Cir. 1975) (*Armocida I*).

ticipants in the conspiracy and to determine the scope of the conspiracy. . .

Second, we must consider the government's reasonable expectation as to the character of, and the parties to, the conversations. . . .

Finally, we are concerned here with the degree of judicial supervision by the authorizing judge. . . . [32]

The agents looking into Gregorio's activities were exploring a wide-ranging conspiracy. In the intercepted conversations, Vento appeared to be an active participant in Gregorio's hijacking schemes. Vento, however, was also engaged in other types of crime. His conversations over Gregorio's telephone sometimes began with talk of narcotics, and later shifted to stolen merchandise. In this respect the case is similar to *Armocida II*,[33] where "some gambling calls turned to other matters, which the agents believed at the time could involve narcotics . . . .."

 When communications deal with multiple crimes, agents must often listen to telephone calls that get under way with matters outside the scope of the authorized investigation so as to be certain that they do not miss later references to the crimes they are supposed to investigate. If a pattern of calls that involve *only* crimes *beyond* the scope of the order should become apparent, the officers might arguably be obliged to obtain a new authorization to intercept such clearly non-related, albeit criminal, communications. However, the defendants do not claim that such a pattern was apparent here. Hijacking- and narcotics-related conversations were intertwined, and the agents could not be certain whether a particular conversation would deal with drugs only or whether it would shortly turn to matters of interest to a hijacking investigation. Courts have permitted intensive surveillance in like circumstances.[34] Minimization is not to be judged by a rigid hindsight that ignores the problems confronting the officers at the time of the investigation.[35] The interception of the conversations of Vento was not unreasonable in the circumstances of this case.

In addition, the surveillance here was subject to judicial supervision. Although section 2518(6) does not require the submission of reports, Judge Hannum directed the government to submit two such statements, and the five-day report related conversations implicating Vento in narcotic dealings.

 Section 2518(6) requires only a showing of "what progress has been made toward achievement of the authorized objective and the need for continued interception." Information on subsidiary matters would be helpful to judicial supervision,[36] but such information is not mandated by subsection 6. It is not reasonable to suppose that the absence of material on drug-related conversations in the ten-day report interfered with effective judicial supervision in the present case. Judge Hannum was already alerted to the discovery of incidental information pertaining to narcotics. The ten-day report was not an account of what had been learned in the previous five days, so much as a statement indicating the need of the government to continue the surveillance and its plans to complete the surveillance by July 2. "The sufficiency of these reports [is] a matter for the supervising judge, and the breadth of his discretion must be viewed in light of the fact that he could . . . have dispensed with

---

32. *Id.* at 44.

33. *United States v. Armocida*, 515 F.2d 49, 53 (3d Cir. 1975) (*Armocida II*).

34. *See Armocida I*, 515 F.2d at 44; *Armocida II*, 515 F.2d at 53; *United States v. James*, 161 U.S.App.D.C. 88, 494 F.2d 1007, 1018–23, *cert. denied*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974).

35. *See Armocida I*, 515 F.2d at 45; *United States v. Scott*, 164 U.S.App.D.C. 125, 504 F.2d 194, 197 (1974); *United States v. Cox*, 462 F.2d 1293, 1300–01 (8th Cir. 1972), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974).

36. *See United States v. Scott*, 170 U.S.App.D.C. 158, 166–67, 516 F.2d 751, 759–60 (1975).

progress reports entirely." [37] The accounts here appear to have been sufficient for Judge Hannum's purposes.

■ Absent a showing that the Gregorio interception was a subterfuge to obtain the probable cause that was needed to justify a subsequent application to tap Vento's telephone, there is no reason to believe that the execution of the Gregorio tap was abusive in that the government agents failed properly to minimize their interceptions. The conversations showing that Vento was involved in narcotic dealings were properly overheard in connection with the investigation of the Gregorio hijacking conspiracy, and there is no ground to suppress the evidence that the Strike Force obtained as a result of the Gregorio surveillance.

### E. The Gregorio Disclosure Order

The government utilized the information pertaining to narcotics that was collected during the Gregorio hijacking wiretap in order first to obtain authorization for the Vento intercept, and later to secure, from the grand juries, the original indictment and the superseding indictment under which the defendants were tried. These uses, charge the defendants, were improper because the government did not obtain a timely disclosure order from Judge Hannum, pursuant to section 2517(5).

On this footing, defendants construct an argument that absent a legitimate basis for the authorization of the Vento interception, the evidence obtained from the Vento surveillance should be suppressed. Defendants also urge that the original indictment was illegally obtained because it was based, in part, on the narcotics information from the Gregorio tap that was disclosed without a judicial order. The claim with respect to the superseding nine-count indictment is not clear. But whatever the thrust of the defendants' complaint, they appear to rely on *United States v. Brodson*,[38] which dis-

missed an indictment based upon wiretap information employed without timely judicial authorization.

Section 2517(5) distinguishes between two types of use that may be made of intercepted communications about offenses other than those specified in the original order of authorization. "Unrelated" communications may be disclosed or used without judicial authorization if such use is in conformity with subsections (1) and (2) of section 2517. Subsections (1) and (2) permit the disclosure of "unrelated" communications to other investigative officers and the use of the communications by the recipient officer "to the extent such use is appropriate to the proper performance of his official duties." On the other hand, subsections (3) and (5) require judicial approval for the disclosure of "unrelated" communications in connection with "giving testimony under oath or affirmation in any proceeding held under the authority of the United States. . . ."

■ The use of the narcotics data from the Gregorio tap compels the Court to inquire whether an *ex parte* application for a wire intercept order constitutes a "proceeding held under the authority of the United States" for the purposes of section 2517(3) and (5). We believe that it does not. The legislative history of section 2517 reveals that subsection (3) "envisions . . . the use and disclosure of such evidence at trial to establish guilt directly, or to corroborate, or to impeach, a witness' testimony, or to refresh his recollection." Subsection (2), in contrast, "envisions use of the contents of intercepted communications, for example, . . . to establish probable cause to search, or to develop witnesses." [39] Thus, Congress appears to have contemplated the employment without judicial authorization of unrelated communications to obtain search warrants.

---

**37.** *United States v. Iannelli,* 477 F.2d 999, 1002 (3d Cir. 1973), *aff'd,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).

**38.** 528 F.2d 214 (7th Cir. 1975), *aff'g* 393 F.Supp. 621 (E.D.Wis.).

**39.** 1968 U.S.Code Cong. & Admin.News, pp. 2188–89 (citations omitted).

Authorizations to intercept communications are subject to more restrictive preconditions than apply to the issuance of traditional search warrants. That difference, however, cannot dilute the principle that underlies the use and regulation of wiretaps—that a wire interception is a type of search. Subject though it may be to special restrictions, because of the peculiar dangers of invasion of privacy, the authorization to intercept should be regarded as a form of search warrant. We see no reason to construe the legislative history of this section by a cribbed and confined reading that would apply the precept *"inclusio unius, exclusio alterius."*

■ Since Congress intended subsection (2) to include applications for search warrants, it would appear, equally, that an application for a wiretap authorization was intended to fall within the ambit of subsection (2) as a "use . . . appropriate to the proper performance of . . . official duties," rather than within the scope of subsection (3), which focuses on the use of wiretap evidence at trial. Hence, the Strike Force did not need a disclosure order to employ the contents of the Gregorio communications in their application to tap Vento's telephone, even though the communications in question were not related to the previously authorized hijacking investigation.

■ Defendants also assail the use of the wiretap evidence at the trial on the ground that the disclosure order was not obtained "as soon as practicable," as required by section 2517(5). The last interception in this case occurred on August 10, 1973, and the disclosure order was issued on January 28, 1974, subsequent to the entry of the original indictment.

A determination of whether the order was obtained "as soon as practicable" requires an examination of the purposes of section 2517(5). Section 2517(5) is designed to permit a district judge to ascertain that the evidence to be disclosed was

> [I]ntercepted in accordance with the provisions of [Title III] . . . . Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.[40]

The order here was obtained prior to the presentation of the evidence to the grand jury that returned the superseding indictment and more than two and one-half months before trial under the original indictment was scheduled to begin. The purpose of section 2517(5) appears to have been served by Judge Hannum's supervision, and there is no allegation that prejudice was inflicted on the defendants by reason of the delay itself.[41] The record does not demonstrate that the disclosure order was not secured "as soon as practicable" for the purposes of section 2517(5).

■ An alternative, and not inconsiderable obstacle to the defendants' objection is that section 2518(10) directs suppression of wiretap evidence if the interception itself was improper in some respect; the Gregorio intercept, however, was properly authorized and executed. A motion to suppress does not appear to lie when the complaint is one of improper disclosure, rather than one of unlawful interception.[42] We find no error in the denial of defendants' motion to suppress the wiretap evidence because of an allegedly untimely disclosure order.

The defendants also contend, citing the Seventh Circuit's recent decision in *United States v. Brodson,* that the unauthorized

---

**40.** 1968 U.S.Code Cong. & Admin.News, p. 2189. *See United States v. Brodson,* 393 F.Supp. 621, 624 (E.D.Wisc.), *aff'd,* 528 F.2d 214 (7th Cir. 1975).

**41.** *Cf. United States v. Iannelli,* 477 F.2d 999, 1003 (3d Cir. 1973), *aff'd,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).

**42.** *See id.* at 1001; *United States v. Denisio,* 360 F.Supp. 715, 720 (D.Md.1973). *See also, United States v. Cafero,* 473 F.2d 489, 499 (3d Cir. 1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974); section I *infra.*

employment of the "unrelated" communications before the grand jury invalidates the indictments. This Court, however, does not find it necessary to decide the issue raised by *Brodson*, namely, whether a disclosure order is essential for presentation of "unrelated" communications to a grand jury. Even if a disclosure order were required, the failure to obtain a disclosure order here could be used only to invalidate the original four-count indictment. That indictment, however, has been dismissed, mooting the question of its validity. The "unrelated" communications presented to the grand jury to secure the nine-count indictment were submitted subsequent to Judge Hannum's disclosure order. That submission created no violation at all, and it was under the nine-count indictment that the defendants were prosecuted and convicted. The dismissal of a properly secured indictment would, of course, be inappropriate in these circumstances.[43]

## F. Application for the Vento Wiretap

We now turn our attention from the Gregorio intercept to the alleged deficiencies of the Vento wiretap.

The government's application for the Vento interception was grounded upon information from confidential informants, from an undercover agent, and from the interception of conversations over Gregorio's telephone. Defendants charge that the Vento application is fatally vulnerable for three reasons: First, it was based upon evidence obtained from the allegedly illegal Gregorio wiretap; second, it failed to supply probable cause for belief that Vento was engaged in criminal activities; and, third, it contained a misstatement of material fact. There is no merit to any of these contentions.[44]

---

**43.** *See United States v. Ortega-Alvarez*, 506 F.2d 455 (2d Cir. 1974), *cert. denied sub nom. Alvarez v. United States*, 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975); *United States v. Senak*, 477 F.2d 304 (7th Cir.), *cert. denied*, 414 U.S. 856, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973).

**44.** Mastrangelo, Mengini, and DeLuca raise an additional point that we do not need to decide on this appeal. They assert that each of them was an "individual" known to the government within the meaning of section 2518, "committing the offense and whose communications [were] to be intercepted . . . ." 18 U.S.C. § 2518(1)(b)(iv), (4)(a) (1970). There is some basis for the belief that the three were known to the government and known to be involved with Vento in his narcotics dealings, either at the time of the original application or at the time of the application for an extension. Thus, these defendants contend that the government's application and Judge Newcomer's authorization should have identified them.

The legislative history on this point is scant, *see* 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2190–91, and the Supreme Court has not ruled definitively in this area. In *United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), the Court explicated the statutory term "known" without having to decide whether the government must identify known parties who may make calls to the facility to which the listening devices are connected, but who are not believed to use the host facility to transmit outgoing calls.

Three circuits have required the identification of all known parties involved in the criminal offense if there is reason to believe that their conversations will be subject to interception. *United States v. Moore*, 168 U.S.App. D.C. 227, 513 F.2d 485 (1975); *United States v. Donovan*, 513 F.2d 337 (6th Cir. 1975), *cert. granted*, 424 U.S. 907, 96 S.Ct. 1100, 47 L.Ed.2d 310, 44 U.S.L.W. 3462 (Feb. 23, 1976) (No. 75–212); *United States v. Bernstein*, 509 F.2d 996 (4th Cir. 1975), *pet. for cert. filed*, 44 U.S.L.W. 3030 (May 27, 1975) (No. 74–1486). *Bernstein* links this requirement with Title III's system of protecting privacy by executive and judicial supervision of investigative agents. With respect to the case before us, it could be argued that the invasion of privacy by interception is as great to the party who calls to the facility under surveillance as to the party whose facility the government has subjected to its monitoring.

The Fifth Circuit, however, declined to suppress, although only the person whose line was subject to surveillance—the host—was identified in the application and authorization. *United States v. Doolittle*, 507 F.2d 1368, aff'd en banc, 518 F.2d 500 (5th Cir. 1975), *pets. for cert. filed*, 44 U.S.L.W. 3307 (No. 75–500), 3308 (No. 75–509), 3820 (No. 75–513) (Oct. 2, 1975). In *Doolittle* there was no prejudice to the other parties, since they received inventories and transcripts and were permitted to listen to the tapes, "as if they had been named in the order," nor was there any "indication of bad faith or attempted subterfuge by the Government." The government argues that a close reading of the statute supports this position because Congress adopted the singular formulation, "person," rather than the "person or persons" language of the New York statute that provided a model for Title III, and linked that person to the

Our conclusions in the preceding sections of this opinion refute the defendants' first contention that the information from the Gregorio wiretap was obtained illegally. The application for the Gregorio wiretap furnished probable cause to believe that Gregorio was engaged in theft from interstate shipment, and that he was using his telephone to further that enterprise. Judge Hannum's authorization for the interception provided for the proper minimization of the surveillance, and the agents who executed the wiretap complied with that order.

The defendants' argument with respect to the sufficiency of the showing of probable cause in the application depends upon the legitimacy of the government's use of the narcotics-related communications overheard during the Gregorio wiretap. Thirty conversations over Gregorio's telephone indicated that Vento was engaged in trafficking in controlled substances and provided probable cause to believe that Vento was dealing in drugs and was using his own telephone in that undertaking.[45] The use of such evidence is alleged by the defendants to constitute "bootstrapping."[46] This is not a case, however, where the government has obtained one authorization on a pretext in order to gather evidence to justify a subsequent application for the interception that it secretly desired, but had insufficient

grounds for seeking, in the first place. Here the original application was thoroughly substantiated, and it is not unusual for an investigation of one crime to uncover leads regarding another crime. To follow the newly discovered trail is the investigator's duty.

■ Title III clearly contemplates that one interception might provide evidence valuable to law enforcement officers engaged in a different investigation. As discussed above, section 2517 allows an agent to disclose to other agents "communications relating to offenses other than those [disclosed] in the order of authorization"[47] and permits the newly informed agents to employ those communications for their own investigative purposes.[48] The exchange of information between the F.B.I. and the DEA in this case complied fully with the provisions of Title III. There was no impropriety, therefore, in the use of the information from the Gregorio tap to secure authorization to intercept Vento's conversations.

■ Defendants attempt to buttress their claim that the application for the Vento wiretap did not supply probable cause to believe that Vento was engaged in criminal activities by arguing that the information in paragraphs 6, 7, 10, 11, and 12 of the application was obtained from confidential

communication facility to be monitored. 1968 U.S.Code Cong. & Admin.News, p. 2191. *See also* § 2518(4) (1970). According to this view, the legislative concern was to protect only the legitimate, noncriminal, privacy interests of those who would be subjected to intensive monitoring because their own telephones were the targets of the intercepts. *Cf.* § 2518(5) (minimization).

This case, however, does not occasion entry into the controversy, since the defendants did not raise an objection at the suppression hearing or at trial. We generally do not consider matters of suppression of evidence if the issue has not been adjudicated by the trial court which is better situated to determine the crucial facts.

**45.** Although all the conversations recorded were conducted on Gregorio's telephone, Vento sometimes called his home to check for messages in connection with his criminal activities and, at one point, left his home phone number

as a contact point for a drug supplier in Brooklyn, New York.

**46.** "Bootstrapping" is described as an abuse in *United States v. Cafero*, 473 F.2d 489, 497 (3d Cir. 1973), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974).

**47.** 18 U.S.C. § 2517(5), (1) (1970).

**48.** 18 U.S.C. § 2517(2) (1970). *See* 1968 U.S. Code Cong. & Admin.News, p. 2188. *E. g.*, *United States v. Tortorello*, 480 F.2d 764 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

The employment of the intercepted conversations to justify extension orders for the same tap was also contemplated by Title III, *see* 18 U.S.C. § 2518(5) (1970), and has been sanctioned by the Supreme Court, *United States v. Giordano*, 416 U.S. 505, 531–32, 94 S.Ct. 1820, 1834, 40 L.Ed.2d 341, 362 (1974).

informants whose reliability was not demonstrated. If those paragraphs were the entire foundation for the government's application, this contention would create a serious problem.[49] Because the Strike Force did not rely exclusively on confidential informants, however, there is ample independent basis in other sections of the application to establish probable cause. That basis may be found in the work of undercover agent Guadagnino, whose investigations confirm the reports of the confidential informants, and in the conversations from the Gregorio wiretap. This information was set forth in paragraphs, 8, 9, and 13 to 43 of the application, and was interpreted in paragraphs 44a to 44dd.

The defendants also maintain that the Vento application was invalid because of a misstatement of a material fact. As the defendants claim, a misstatement of a material fact may be grounds for nullifying an authorization and the surveillance pursuant to it.[50] Here the misstatement appears in the quotation of a conversation intercepted during the Gregorio wiretap. Vento had been overheard conversing with Donald Woodruff, also known as "Chips." Chips stated that he got high on "that stuff." Vento asked "On what? The girl?" The application reported Chips to have replied, "No, the meth." The government subsequently corrected the transcript to show that Chips had not said, "No, the meth" but simply "No." There was, therefore, no direct mention of a controlled substance in the conversation.

It appears to be the argument that without reference to "the meth" there would have been no reason to suppose that any of the conversations overheard during the Gregorio tap pertained to dealings in drugs. Therefore, the defendants say the misquotation was material because it was the key to breaking the code employed by Vento and his associates.

The law respecting misstatement of fact in applications for wiretap authorizations is discussed in United States v. Armocida.[51] Essentially, the Seventh Circuit standard,[52] which has been adopted by the Eighth Circuit as well,[53] provides for the suppression of evidence secured by court orders based on misrepresentation when it is found that the government has misrepresented a material fact, either recklessly or intentionally. The Fifth Circuit, however, has adopted a somewhat different approach.[54] It would suppress evidence when there has been an intentional misrepresentation of a fact, whether or not material, or when there has been an unintentional misrepresentation of a material fact.

▮ In Armocida the misrepresentation was not alleged to be intentional and the facts misstated were not material; therefore, it was unnecessary for this Court to choose between the two rules.[55] Nor does this case compel a choice between the standards, and for the same reason. Defendants do not urge, nor is there any reason to conclude, that the government made an advertent misrepresentation. Without intentional misstatement, both standards require material error as a basis for suppression of evidence, but the misstatement in the application in this case is not material. Even without the Vento-Chips conversation,

**49.** See Section A supra.

**50.** See United States v. Armocida, 515 F.2d 29, 41 (3d Cir. 1975).

**51.** Id.

**52.** United States v. Carmichael, 489 F.2d 983, 988–89 (7th Cir. 1973) (en banc).

**53.** United States v. Marihart, 492 F.2d 897, 900 (8th Cir. 1974), cert. denied, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974), accord, United States v. Garofolo, 496 F.2d 510, 511 (8th Cir.),

cert. denied, 419 U.S. 860, 95 S.Ct. 109, 42 L.Ed.2d 94 (1974).

**54.** United States v. Thomas, 489 F.2d 664, 669 (5th Cir. 1973), accord, United States v. Hunt, 496 F.2d 888, 894 (5th Cir. 1974).

**55.** 515 F.2d at 41–42. For similar results, see United States v. Belculfine, 508 F.2d 58 (1st Cir. 1974); United States v. Baynes, 400 F.Supp. 285, 296–97 (E.D.Pa.1975), appeal docketed, No. 75–1435 et al., 3d Cir., Apr. 30, 1975; United States v. Wolfe, 375 F.Supp. 949, 954 (E.D.Pa.1974).

twenty-nine intercepted communications remain in the application to supply substantial alternative grounds to grant the authorization of a tap on Vento's line. Moreover, there is no indication that the supposed mention of "the meth" was necessary for the government's expert investigators to break whatever code Vento and his colleagues may have used.[56] Indeed, the code words employed by Vento do not seem to be unique to his operation. They are used by others who deal illegally in controlled substances.[57]

Accordingly, there was no impropriety in the application for the Vento intercept.

## G. The Attorney General's Authorization

The government attached to its application for the Vento wiretap an electronic reproduction of Attorney General Elliot Richardson's authorization for the intercept. Apparently by neglect, the original of this authorization was not submitted until the suppression hearing. Relying on United States v. Giordano,[58] the defendants protest that the failure to supply the original memorandum with the application for the authorization is a violation of the letter and spirit of Title III.[59] They aver that a rule that the original be offered to the issuing judge would serve to protect against illegal authorization.

In Giordano the Supreme Court stated that:

Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device. . . We are confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored.[60]

The Supreme Court upheld the suppression of wiretap evidence when a departmental authorization was issued by the Executive Assistant to the Attorney General rather than by statutorily designated officials. In the case at hand, however, there is no doubt that the government complied with the statutory authorization procedures. Departmental authority came from the Attorney General himself, thereby serving the statutory interest of restricting control to officials responsive to the political process.

This case bears a marked resemblance to that aspect of United States v. Chavez in which the Supreme Court held that misidentification of the official authorizing the application did not warrant suppression, because the misidentification "did not affect the fulfillment of any of the reviewing or approval functions required by Congress . . . ."[61] "Where it is established that responsibility for approval of the application is fixed in the Attorney General . . . compliance with the screening requirements of Title III is assured, and there is no justification for suppression."[62]

▮ Although introduction of original memoranda would assist in the authentication of the government's representations to

---

**56.** Cf. United States v. Cirillo, 499 F.2d 872, 881 (2d Cir.), cert. denied, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); United States v. Barrone-Inglar, 469 F.2d 419, 421 (2d Cir.), cert. denied, 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1972).

**57.** E. g., United States v. James, 161 U.S.App. D.C. 88, 494 F.2d 1007, 1030 (1974).

**58.** 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

**59.** See 18 U.S.C. §§ 2516(1), 2518(1)(a), 2518(4)(d) (1970).

**60.** 416 U.S. at 527–28, 94 S.Ct. at 1832, 40 L.Ed.2d at 360.

**61.** United States v. Chavez, 416 U.S. 562, 575, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380, 392 (1974). Cf. United States v. Falcone, 505 F.2d 478, 483–84 (3d Cir. 1974), cert. denied, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975).

**62.** 416 U.S. at 572, 94 S.Ct. at 1854, 40 L.Ed.2d at 390; accord, United States v. Acon, 513 F.2d 513 (3d Cir. 1975); United States v. Swann, 526 F.2d 147 (9th Cir. 1975) (per curiam).

the court, the application here was sufficient since section 2518(1)(a) does not require any particular documentation. Because the original authorization was available and was provided in connection with the suppression hearing, there was no prejudice to the defendants in this respect.

## H. Minimization in the Vento Intercept

Based on the minimization requirements of the Act, three grounds are suggested by the defendants for the suppression of evidence obtained from wiretapping Vento's telephone. They assert that the authorization order itself was invalid for failure to include minimization language, that the order was illegal because it permitted an overly broad search, and that the officers executing the interception so disregarded the statutory requirements of minimization that all evidence derived from the wiretap should be held inadmissible at trial.

Although Judge Newcomer's authorization order confined the interception to a maximum duration of fifteen days, only half the period permitted by Title III, defendants argue that it did not include a provision, required by section 2518(5), that the authorization to intercept "shall be executed as soon as practicable [and], shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . ." The order did, however, comply with section 2518(4) which requires, inter alia, the specification of:

(a) the identity of the person . . . whose communications are to be intercepted;

(b) the nature and location of the communications facilities as to which . . authority to intercept is granted;

(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates; . . .

(e) the period of time during which such interception is authorized. . . .

Nonetheless, relying upon State v. Seigel,[63] defendants claim that a technical deviation is fatal to an order despite substantial compliance with the statute.

In Cafero,[64] this Court held that the minimization requirements of Title III were essential to upholding its constitutionality. The Supreme Court, however, has distinguished between insufficiencies that are critical to the Congressional purposes in enacting Title III, and those that are merely technical. In Giordano[65] it upheld the suppression of wiretap evidence when the interceptions had been authorized by an official outside the restricted group entitled by the Act to issue departmental authorizations. The Supreme Court in Chavez,[66] however, ruled that:

'[f]ailure to correctly report the identity of the person authorizing the application, . . . when in fact the Attorney General has given the required preliminary approval to submit the application, does not represent a similar failure to follow Title III's precautions against the unwarranted use of wiretapping or electronic surveillance and does not warrant the suppression of evidence gathered pursuant to a court order resting upon the application.'

We relied on Chavez to hold, in United States v. Acon,[67] that a "minor facial insufficiency" in an interception order does not require its invalidation if there has been substantial compliance with the law and if only "less crucial requirements" were actu-

---

**63.** 292 A.2d 86 (Md.1972). The view, expressed in Seigel, that technical deficiencies are fatal to a warrant despite substantial compliance goes beyond the holdings in Cross v. State, 171 S.E.2d 507 (Ga.1969), and Johnson v. State, 177 S.E.2d 699, 701 (Ga.1970), on which it relies. The Georgia cases did not have the mitigating factor of substantial compliance with the minimization requirement.

**64.** 473 F.2d 489, 495–97 (3d Cir. 1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974).

**65.** 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

**66.** 416 U.S. 562, 571, 94 S.Ct. 1849, 1854, 40 L.Ed.2d 380, 390 (1974).

**67.** 513 F.2d 513 (3d Cir. 1975).

ally breached. The question, then, is whether the absence of minimization language in the Vento interception order constitutes a "minor facial insufficiency" or whether the absence of such a provision goes to the heart of the restrictions on wiretapping imposed by Congress.

The Second Circuit, in *United States v. Cirillo,*[68] has decided that the "omission of the talismanic minimization language" does not vitiate an interception order. It is a mere "technical defect," the Second Circuit held, so long as the monitoring officers were aware of the requirement of minimization and abided by it. The *Cirillo* case was cited in *Acon* for the proposition that "suppression is not required for [every minor] insufficiency," but the Court in *Acon* observed that "we do not necessarily support the Second Circuit's view that failure to include a minimization order is a minor facial insufficiency."[69] Although the issue was reserved in *Acon,* it must now be decided. In making this decision, we are fortunate to have available to us the opinion of Judge Becker in *United States v. Baynes.*[70]

In *Baynes,* faced with the inadvertent omission of the minimization provision, Judge Becker decided to follow the example of the Second Circuit in *Cirillo.* The lack of minimization language and the omission of a provision to execute as soon as practicable were deemed a technical insufficiency, subject to correction by affidavit or testimony.[71] If such a facial insufficiency has been cured in fact, there is no reason to require suppression. The absence of the minimization provision called for in section 2518(5) need not always subvert the purposes of the statutory scheme.

■ It is possible to have substantial compliance with the requirements of Title III although the minimization language has not been included in the order. Compliance could be proven at a hearing on the basis of testimony, affidavits and the logs of the intercepting agents. A hearing could also show whether the failure to include the minimization language had prejudiced the defendant. Where, despite the want of a provision, minimization procedures were in fact executed, there would be no harm to a defendant. "[Indeed,] the curative effect of a finding of nonprejudice is the touchstone of the holding in *Cirillo* . . . ."[72]

■ Finally, the minimization clause would appear to be a "less crucial" requirement of Title III. The minimization proviso of section 2518(5) complements the specific requirements of section 2518(4), but it is section 2518(4) that gives "significant directions to law enforcement officials as to how reasonable interception will be minimized." The failure to include the minimization phrase when the basic guidelines have been supplied and where there exists a means of measuring compliance with the minimization provisions of the statute cannot be said to be fatal. It was not the intent of Congress to mandate the suppression of evidence for every facial irregularity in a warrant.[73]

■ Applying the substantial compliance test to the facts of this case, we uphold the district court's denial of the motion to suppress the evidence obtained from the Vento interception. Despite the absence of the minimization provision, the agents were instructed to carry out minimization procedures and the interception of many phone calls was, in fact, terminated. Because of the five- and ten-day reports submitted to Judge Newcomer by the Strike Force, the surveillance was also subject to close supervision, beyond the requirements of both Title III and the order itself. Given this

---

**68.** 499 F.2d 872, 878–80 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974). *Cirillo* interpreted a provision of the New York wiretap statute, C.P.L. 700.30(7) (1971), which is identical with § 2518(5) in this respect.

**69.** 513 F.2d at 518–19, 519 n.15.

**70.** 400 F.Supp. 285 (E.D.Pa.1975), appeal docketed, No. 75–1435 et al., 3d Cir., Apr. 30, 1975.

**71.** *Id.* at 309.

**72.** *Id.*

**73.** *See* 1968 U.S.Code Cong. & Admin.News, pp. 2184–85.

substantial compliance, no prejudice to the defendant resulted from the absence of the minimization language.

■ The defendants next object to the broad scope of the interception directive. Like Judge Hannum's order for the surveillance of Gregorio, Judge Newcomer's order for the Vento wiretap permitted the continuation of the surveillance

> until communications are intercepted which revealed the details of the manner in which Steven Vento and others yet unknown, participate in the distribution, possession and possessing with intent to distribute controlled substances . . . and which reveal the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of fifteen (15) days from the date of this order, whichever is earlier.

As we have already held in connection with Judge Hannum's order,[74] an authorization of this scope is permissible under Title III and there is no basis for invalidating the directive because of overbreadth.

■ According to the defendants, even if the order itself was sufficient, it was executed improperly because the agents were given inadequate minimization instructions and too extensive a discretion to intercept. Defendants observe that the agents who conducted the tap were not given copies of the order, and were instructed to listen to conversations involving not only narcotics, but also "all criminal activity." Defendants, however, neglect to consider that the supervising agent read the order to the agents. It may be the better practice to distribute a copy of the order to each agent, but the reading was sufficient to inform the agents of the limited scope of the investigation.

■ Moreover, the agents were instructed to minimize interceptions and to listen only to those conversations that pertained to criminal activities. Although there was testimony that the agents were instructed to intercept conversations involving criminal conduct outside the area of the authorized investigation, the suppression judge was satisfied that the agents had complied with the statutory minimization requirement.[75]

As described above,[76] Vento was engaged in several different types of criminal activity; hence the agents had a reasonable basis to believe that Vento's communications might turn from one type of "unrelated" crime to the narcotics activity which was the specific focus of the investigation. The instruction, then, would appear to be no more than authority to intercept all possibly relevant conversations and such other unrelated criminal communications as inadvertently came into "plain earshot." This interpretation of the instruction is implicit in the finding by the suppression judge that the agents complied with the requirements of the Act.

There being no violation of the act in the execution of this interception, there is no need to consider the defendant's contention that total suppression is the appropriate remedy for a violation of the minimization requirements.[77]

---

74. Notes 21–29 *supra* and accompanying text.

75. *Compare United States v. George*, 465 F.2d 772 (6th Cir. 1972). There the monitoring agents had not been informed in any way of the extent of the order and its minimization requirements, and there was a complete disregard for minimization.

76. *See* section D *supra*.

77. *United States v. George* provided for total suppression, in a context of complete absence of minimization. *See also United States v. Focarile*, 340 F.Supp. 1033, 1046–47 (D.Md.) (dictum), *aff'd sub nom. United States v. Giordano*, 469 F.2d 522 (4th Cir. 1972), *rev'd on other grounds*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *United States v. Scott*, 331 F.Supp. 233, 248 (D.D.C.1971), vacated, 164 U.S.App.D.C. 125, 504 F.2d 194 (1974). Some cases suggest that the appropriate remedy for failure to minimize is the suppression of only those conversations that would not have been intercepted but for improper lapses from minimization. *See State v. Spease*, 319 A.2d 560, 567–73 (Md.1974); *accord, United States v. King*, 355 F.Supp. 523, 543–45 (S.D.Cal.1971), *modified*, 478 F.2d 494 (9th Cir. 1973), *cert. denied*, 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d

## I. Service of the Inventories

Section 2518(8)(d) provides that:

Within a reasonable time but not later than ninety days after . . . the termination of the period of an order or extensions thereof, the issuing . . . judge shall cause to be served, on the persons named in the order . . . and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of—

(1) the fact of the entry of the order . . .

(2) the date of the entry and the period of authorized . . . interception . . .

(3) the fact that during the period wire or oral communications were . . . intercepted.

. . . On an ex parte showing of good cause to a judge of competent jurisdiction the service of the inventory required by this subsection may be postponed.

Defendants protest that the government delayed for greater than a reasonable time before serving the inventories on them, and in any event the service took place after ninety days had lapsed. Actual service of the inventory occurred toward the end of the ninety-day period with respect to all defendants, except DeLuca and Mengini.[78] DeLuca was served a copy of the Gregorio inventory on the ninety-fourth day and a copy of the Vento inventory on the one hundred second day. Mengini was served a Gregorio inventory on the one hundred second day.

The contention regarding delay in service of the inventories is not convincing. It is by no means certain that the ninety-day proviso applies to the service itself; the language of the section would appear to indicate that it applies to the action of the judge in ordering the services of the inventory. Subsection (8)(d) does not say that "the inventory shall be served within ninety days." Rather, it states that "within a reasonable time but not later than ninety days . . . the . . . judge shall cause" the inventory to be served. There is no claim here that the judges' orders issued outside the ninety-day limitation of the statute.

Even assuming, however, that the ninety-day period is applicable to actual service of the inventory, or that the order here did not issue within a reasonable time even though it was filed within the ninety days, there is no reason to suppress the wiretap evidence in this case. Several times this Court has addressed the issues presented in this argument. In *Cafero*, we declined the invitation to invalidate *ab initio* "a search [that] may be deemed reasonable, and therefore constitutional during the various stages of application for authorization, execution, supervision of the interception, and termination, . . . because of the operation of some condition subsequent, to-wit, failure to give notice of the items seized."[79] As we observed then:

In the context of traditional search warrants, a failure to comply with certain procedural requirements of F.R.Cr.P. 41 has been held not to amount to deprivation of Fourth Amendment rights necessitating suppression. Thus, failure to deliver a copy of the warrant to the party

94 (1973); *United States v. LaGorga*, 336 F.Supp. 190, 195–97 (W.D.Pa.1971); *United States v. Iannelli*, 339 F.Supp. 171, 173 (W.D. Pa.1971), *aff'd* 477 F.2d 999 (3d Cir. 1973), *aff'd* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). In *United States v. Cox*, 462 F.2d 1293, 1301–02 (8th Cir. 1972), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974), it was suggested that the appropriate remedy may be found in section 2520, the civil damages provision of the Act.

78. Only Vento, however, has a clear statutory right to an inventory. The other defendants, not having been named in the authorization, are entitled to an inventory only as "the judge may determine in his discretion that is in the interest of justice . . . ." 18 U.S.C. § 2518(8)(d) (1970).

79. *United States v. Cafero*, 473 F.2d 489, 499 (3d Cir. 1973), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974).

whose premises were searched until the day after the search does not render the search "unreasonable" in terms of the Fourth Amendment. *United States v. McKenzie*, 446 F.2d 949 (6th Cir. 1971). Similarly, delay in the execution of the warrant does not render inadmissible evidence seized, absent a showing of prejudice to the defendants resulting from the delay. *United States v. Harper*, 450 F.2d 1032 (5th Cir. 1971).[80]

Where the failure to file the notice of inventory resulted from an act which "on its face deliberately flouted and denigrated the provisions of Title III designed for the protection of the public" this Court has upheld the suppression of evidence obtained from the interception. But "the touchstone of our decision . . . [was] not [that] an inventory was delayed but rather [that] specific provisions of Title III were deliberately and advertently not followed."[81] There is no ground for supposing such abusive practices in the case at hand.

The defendants rely on *United States v. Donovan*,[82] which required suppression of evidence when the government completely failed to notify the defendants of the interception of their conversations. Here, however, the government has not completely failed to advise the defendants about the interceptions. Rather, there was only a delay in the service of inventory. In *United States v. Iannelli*, this Court held that suppression is not required unless there was a showing of actual prejudice as a result of the failure of notice.[83] Iannelli presented a more sympathetic case than do the present defendants, since he suffered from a total absence of formal notice, not merely a delay. Nonetheless, we ruled that the absence of formal notice may be cured by actual notice, and that no prejudice resulted from the lack of notice in *Iannelli*. The Sixth Circuit in *Donovan* also made the fact

of prejudice central to its decision to suppress, holding that the absence of *any* notification was necessarily prejudicial.

■ Certainly Vento and his colleagues have failed to demonstrate prejudice in this case, even assuming that there has been a technical infringement of the statutory provision. Without such a showing, there is no foundation to suppress the evidence obtained by means of the interception.

## THE IDENTIFICATION OF MASTRANGELO'S VOICE

Mastrangelo raises an issue ancillary to the wiretap arguments advanced by the defendants. He contends that there was insufficient evidence to permit a positive identification of his voice. He also claims that significant portions of the evidence relied upon for identification were obtained by improper subterfuge.

The identification of Mastrangelo's voice by Agent Miller of the DEA was predicated on two face-to-face conversations and upon telephone discussions between Miller and Mastrangelo on the day of the latter's arrest. Miller admits that he deliberately served Mastrangelo with the wiretap inventory and engaged Mastrangelo in conversation in order to identify Mastrangelo's voice. Miller, however, could not remember the precise content of these talks.

■ Besides Miller's testimony, the government introduced circumstantial evidence to link Mastrangelo to the intercepted communications: The caller in question identified himself as "Adrian," Mastrangelo's first name. In addition, physical surveillance revealed that a man of Mastrangelo's general physique, traveling in Mastrangelo's car or on his motorcycle, visited Vento's home. There was, however, no positive identification of that visitor. The evidence was properly admitted, and Judge

---

80. *Id.; accord, United States v. Hall*, 505 F.2d 961 (3d Cir. 1974).

81. *United States v. Eastman*, 465 F.2d 1057, 1062 (3d Cir. 1972).

82. 513 F.2d 337, 343 (6th Cir. 1975), *cert. granted*, 424 U.S. 907, 96 S.Ct. 1100, 47 L.Ed.2d

310, 44 U.S.L.W. 3462 (U.S. Feb. 23, 1976) (No. 75–212).

83. 477 F.2d 999, 1003 (3d Cir. 1973), *aff'd*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).

Green followed the guidelines laid down in *United States v. Barber*[84] in instructing the jury on identification. This evidence was not insufficient as a matter of law.

It is permissible to base the identification of a voice heard in intercepted conversations on relatively few conversations between an agent and the accused person,[85] and it is not required that such exchanges occur prior to interception.[86] In fact, it is not necessary to present direct evidence to identify the intercepted voice. Circumstantial evidence has often been employed to identify callers on tapped lines.[87] Accordingly, we believe that the questions of weight and sufficiency of the evidence relating to the identification of Mastrangelo's voice were matters for the jury.[88]

Furthermore, there was no illegal subterfuge in this respect. Agent Miller personally delivered the inventory to Mastrangelo for the sole purpose of assessing Mastrangelo's voice, but the defendant knew that he was dealing with a DEA agent and that the agent was interested in him because of a wiretap. Mastrangelo had no reasonable expectation of privacy with respect to his voice,[89] and he cannot be said to have been compelled to incriminate himself by the conversations.[90]

In these circumstances, there is no basis to overrule the jury's verdict and the factfinder's implicit identification of "Adrian" as Mastrangelo.

## SEARCH OF DeLUCA'S CAR

Vento and DeLuca remonstrate that the August 10th search without warrant of DeLuca's car was improper because the government could have obtained a warrant to be served on DeLuca at the time of his arrest or could have seized DeLuca's car and then obtained a warrant. These contentions are refuted by both the facts and the law.

As a result of a conversation intercepted about 11:25 a. m. on August 10, the DEA was alerted that DeLuca might purchase methamphetamine from Vento. It was not until 3:25 and 3:54 that afternoon, however, that the DEA learned from the wiretap that the sale was definite. Shortly thereafter, DeLuca arrived, empty-handed, at Vento's house. In a few minutes DeLuca left carrying a small brown paper bag. He then drove off, trailed by the arresting officers, stopped about three blocks away, and hurriedly left his car. At that point DeLuca was arrested and handcuffed by agents of the DEA and the Philadelphia police.

A check of DeLuca's person having failed to reveal the suspect bag, DEA agents decided to search his car, where they discovered the brown paper bag. Opening the bag, the agents found a white powder that they believed to be a controlled substance and that turned out to be methamphetamine. The car was then moved to permit a further search.

DeLuca asserts that a warrant for the search of his car ought to have been

**84.** 442 F.2d 517, 526–28 (3d Cir. 1971).

**85.** See *United States v. Valdes*, 417 F.2d 335 (2d Cir. 1969), *cert. denied*, 399 U.S. 912, 90 S.Ct. 2206, 26 L.Ed.2d 566 (1970).

**86.** See *United States v. Romano*, 482 F.2d 1183, 1194 (5th Cir. 1973), *cert. denied sub nom. Yassen v. United States*, 414 U.S. 1129, 94 S.Ct. 293, 38 L.Ed.2d 216 (1974); *United States v. Barrone-Iglar*, 468 F.2d 419, 421 (2d Cir. 1972), *cert. denied sub nom. Pineda v. United States*, 409 U.S. 981, 93 S.Ct. 315, 34 L.Ed.2d 244 (1972) and *sub nom. Gernie v. United States*, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973); *United States v. Cox*, 449 F.2d 679, 690 (10th Cir. 1971), *cert. denied*, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972).

**87.** See, e. g., *United States v. Alper*, 449 F.2d 1223, 1229 (3d Cir. 1971), *cert. denied sub nom. Greenberg v. United States*, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972); *Noriega v. United States*, 437 F.2d 435 (9th Cir.), *cert. denied*, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971); *Palos v. United States*, 416 F.2d 438, 440 (5th Cir. 1969), *cert. denied*, 397 U.S. 980, 90 S.Ct. 1107, 25 L.Ed.2d 391 (1970).

**88.** *United States v. Barber*, 442 F.2d at 526–27.

**89.** *United States v. Dionisio*, 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67, 79 (1973).

**90.** *Id.* at 5–7, 93 S.Ct. at 767–768, 35 L.Ed.2d at 74–75.

obtained after the 11:25 a. m. conversation was intercepted, since the agents could have anticipated the afternoon's search. This argument is not persuasive, however, because the agents could not have known with any certitude that DeLuca would meet Vento that afternoon. And they did not know how DeLuca would travel to the Vento residence, whether by his own car or in another, until he actually arrived. It is not evident that there was probable cause for the search of DeLuca's car in time to obtain a warrant.[91]

In the alternative, and conceding that the agents had probable cause to stop him, DeLuca maintains that the agents could have seized his car, but should have refrained from searching it until they had obtained a warrant for that purpose. DeLuca points to *Coolidge v. New Hampshire*[92] as authority for the proposition that a car may be searched without warrant only if it is vulnerable to seizure, or intrusion and tampering, by colleagues of the accused. According to DeLuca, the subsequent removal of the car demonstrated that there were no exigent circumstances to justify an immediate search without warrant.

*Coolidge*, however, does not restrict police searches of automobiles where the occasion to search the vehicle arises suddenly. The search in *Coolidge* was declared improper in a situation where "the police had known for some time of the probable role of the . . car in the crime," and where there were "no confederates waiting to move the evidence . . . ." Where "the circumstances that furnish probable cause to search a particular car for particular articles are . . . unforeseeable," and where "the opportunity

to search is fleeting since a car is readily movable," *Chambers v. Maroney* permits a car to be searched without a warrant.[93] As the Supreme Court recently reaffirmed,[94] the *Chambers* rule applies even to the search of a car that can be removed and safeguarded from possible access by associates of the suspect.

The authority to search without a warrant—alluded to in *Chambers*—depends upon the exigent circumstances that exist at the time the car is stopped by the police:

> The car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible.[95]

If conditions permit, the police may seize the car and hold it pending the issuance of a warrant for its search, but they are not obliged to do so.[96] Where the police may seize a car without a warrant, they may conduct a warrantless search on the street, or even subsequently at the stationhouse.[97] The Court in *Chambers* declared:

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.[98]

The circumstances applicable to the search at issue here are similar to those that pertained in *Chambers*. DeLuca's car had been stopped on a public street, not

**91.** *See United States v. Gattie,* 511 F.2d 608, 610 n.3 (5th Cir. 1975).

**92.** 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

**93.** 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428 (1970).

**94.** *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975) (per curiam).

**95.** *Chambers v. Maroney,* 399 U.S. at 51, 90 S.Ct. at 1981, 26 L.Ed.2d at 428.

**96.** *Id. But see United States v. Valen,* 479 F.2d 467, 472 (3d Cir. 1973) (Adams, J., concurring). *Cf. United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

**97.** 399 U.S. at 52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428.

**98.** *Id. See United States v. Valen,* 479 F.2d at 470–71; *United States v. Menke,* 468 F.2d 20, 22–23 (3d Cir. 1972).

parked in a driveway, and it was therefore easily accessible to confederates. Indeed, any accomplices of the robbers in *Chambers* would have been totally unaware of the arrest of their compatriots, but since DeLuca's car had been stopped near Vento's home, the agents had some reason to fear that DeLuca's co-conspirators might learn of his situation. The need to search DeLuca's car arose suddenly and it was not possible for the DEA agents to obtain a warrant for the search of the car prior to DeLuca's arrest.[99] Thus, this case is readily distinguishable from *Coolidge* where "the opportunity for search was . . . hardly 'fleeting.'"[100] Rather the present case falls clearly into the class of searches permitted by *Chambers*, and it was not improper to deny the defendants' motion to suppress the evidence discovered in DeLuca's car.[101]

## THE SINGLE CONSPIRACY

Leaving the problems of wiretaps and searches, we turn now to the issue of conspiracy.

Mengini and Mastrangelo concede that there was sufficient evidence to link each of them separately with Vento in plans to distribute methamphetamine. They aver, however, that there was not enough evidence to link either of them to a conspiracy involving any of the other defendants, including each other. Each, therefore, claims that any statements made by the other defendants, except for statements made by Vento in conversation with each of them, were not admissible against them as declarations by co-conspirators.

It is a well-established exception to the hearsay rule that out-of-court declarations by one conspirator may be used against another conspirator, but only if such declarations were made "during the course of and in furtherance of the conspiracy charged . . ."[102] Mengini and Mastrangelo are alleged to have conspired with all of the other defendants to distribute methamphetamine. In *Kotteakos v. United States*, the Supreme Court held that proof of similar enterprises linked only by a common member is not enough to establish a conspiracy encompassing all parties to all the transactions.[103] Proof that Vento plotted with Mengini to distribute methamphetamine, that he schemed with Mastrangelo to do the same, and that he had similar arrangements with the other defendants, would not without more permit the introduction of the declarations made in conversation between Vento and the other defendants against either Mengini or Mastrangelo. The government must also show that the declarations by Vento and the other defendants were made in furtherance of the same undertaking in which Mengini or Mastrangelo participated. Unless there is a common enterprise that links all of the defendants, the statements of Vento and the other defendants cannot be said to have occurred "during the course of and in furtherance of" the criminal activities of Mengini or Mastrangelo.

---

**99.** *Compare Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (Plurality opinion of Blackmun, J.); *Haefeli v. Chernoff*, 526 F.2d 1314 (1st Cir. 1975); *United States v. Moody*, 485 F.2d 531, 535–36 (3d Cir. 1973).

**100.** 403 U.S. at 460, 91 S.Ct. at 2035, 29 L.Ed.2d at 579.

**101.** At oral argument, but not in their briefs, defendants made the further contention that the DEA agents should not have opened the paper bag that was found in the car. Instead, defendants claim, they should have seized the bag and obtained a search warrant to open it. Here the contents of the bag were the very object of a legitimate search under exigent cir-

cumstances. The agents had probable cause to believe that the bag contained methamphetamine. In these circumstances, to restrict the agents from opening the bag would appear to strain the meaning of the Fourth Amendment and erode the powers of the police to conduct legitimate searches efficiently.

**102.** *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). *See United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039, 1060 (1974).

**103.** 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557, 1571 (1946). *Cf. United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975).

It does not suffice for the government to show that the common conspirator, Vento, was implicated in a larger "chain" with Mengini or Mastrangelo. Considering the factual contours of this case, the government must have proved a "wheel-type" conspiracy, with Vento at the hub and Mengini, Mastrangelo, and the others on the spokes.[104] The government must have provided a basis for concluding that each defendant knowingly participated in, or was looking to participate in, a prohibited scheme, and that the circumstances were such that each participant had reason to believe that the enterprise could not be conducted without the participation of others, although the identities of such other conspirators may have been unknown.

In order to introduce the declarations of the remaining defendants against Mengini and Mastrangelo, the government must have established that Mengini and Mastrangelo had taken, or sought to take, a role in Vento's arrangements for the distribution of a controlled substance. The government must also have furnished information permitting the inference that Vento needed to cooperate with several distributors for his scheme to work and that the distributors had reason to understand this fact. Given such evidence, there could be an inference that Mengini and Mastrangelo were in conspiracy not only with Vento, but also with the other distributors who dealt with Vento, even though Mengini and Mastrangelo may have been ignorant of the identity of such other persons.

Here the government introduced evidence that in the course of nine days Mengini engaged Vento in seven conversations regarding plans to supply methamphetamine. Mengini arranged to act as a distributor for the methamphetamine which Vento would provide; on another occasion he arranged to furnish methamphetamine to Vento. He discussed his other source of supply with Vento, discussed the methods of diluting various drugs, and they talked about an occasion in the past when Vento had sold methamphetamine to Mengini.

Mastrangelo was overheard on July 26 asking Vento to supply him with a quarter pound of methamphetamine for a customer. The wiretap was discontinued on July 27, but was renewed August 2. On August 8 Mastrangelo called Vento four times in order to secure a half-pound of methamphetamine for resale. Vento suggested that Mastrangelo come to Vento's house to get a sample of the substance for his customer. Vento's residence was soon placed under physical surveillance, and agents saw a man of Mastrangelo's physique leave the house and ride away on Mastrangelo's motorcycle. Less than an hour later, Mastrangelo called Vento to report that his customer was dissatisfied with the sample, and that the deal was off. The transcripts of the conversations indicate that the parties were well known to each other and appeared to recognize each other by voice alone.

The government's proof also demonstrated that Vento was a large-scale trafficker in methamphetamine and that he dealt only in quantities of about half of a pound or more. He told Mastrangelo to send customers seeking only small amounts to "Tommy," defendant Ricciardi.

■ Based on this testimony, the jury returned a verdict of guilty with respect to both Mengini and Mastrangelo, as well as all the other defendants. Thus, we must examine the evidence in the light most favorable to the prosecution.[105] The presentation here was sufficient to demonstrate that Mengini had a continuing connection with Vento and that he would act as a distributor or as a supplier of methamphetamine, depending upon the circumstances.

104. See United States v. Ortega-Alvarez, 506 F.2d 455, 457 (2d Cir. 1974), cert. denied sub nom. Alvarez v. United States, 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975); United States v. Sisca, 503 F.2d 1337, 1345 (2d Cir. 1974); United States v. Bynum, 485 F.2d 490, 497 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); United States v. Bruno, 105 F.2d 921, 923 (2d Cir.), rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939).

105. United States v. Kates, 508 F.2d 308, 310 (3d Cir. 1975).

The evidence was also adequate to show that Mastrangelo sold methamphetamine on a commercial basis and that he served repeatedly as a middle-level distributor in Vento's scheme. The fact that Vento operated a large-scale distribution scheme would permit an inference that the enterprise required several distributors, and that the scale of operation and the necessary involvement of persons other than Vento would have been obvious to each person who did business with Vento on a regular basis.

▮ Thus, the government established the existence of a wheel conspiracy, with Vento at the hub and the other defendants, including Mengini and Mastrangelo, on the spokes. Mengini, as a supplier and distributor, and Mastrangelo, as a distributor, could be found by the jury to be in conspiracy not only with Vento, but also with all others who participated on the same basis in Vento's conspiracy to distribute methamphetamine, even if the identification of the other conspirators was unknown to Mengini and Mastrangelo at the time. In view of this, it was not error for the trial court to permit the jury to consider the statements of the other defendants against Mengini and Mastrangelo as declarations of co-conspirators.

## THE "TAINTED" JUROR

Mrs. Bewley, an alternate juror, had a brother whose brother-in-law, Reginald Cullen, was murdered some ten years before the trial in this case. Vento had been accused of Cullen's murder, but had been acquitted. Although Mrs. Bewley did not participate in any of the deliberations of the jury, Vento and the other defendants fear that Mrs. Bewley may have poisoned the minds of those jurors who did deliberate on the defendants' fate. The defendants aver that when Mrs. Bewley testified at the post-trial hearing to having had no conversations about Vento with the other jurors

she was not a straightforward witness. They also claim that the trial court abused its discretion in refusing to permit the defendants' counsel to interrogate the jurors with respect to any tainted conversations the jurors may have had with Mrs. Bewley. Without such interrogation, it is asserted, it was impossible for the defendants to discover whether the jury had been prejudiced.

The initial motion for a hearing on this issue was denied because defendants' only information derived from an anonymous tip, and did not identify the suspect juror. When Richard Costello, who was Mrs. Bewley's nephew, came forward, however, a hearing was granted.

At the hearing, on July 31, Costello recounted a conversation with his aunt *which occurred subsequent to her dismissal from the jury.* He recalled only that their talk consisted of an inquiry about Mr. Rief, who was attorney to both Costello and defendant Mengini. Costello's account made no reference to Vento at all. Mrs. Bewley testified that she had discussed Vento with Costello, but denied discussing Vento with any of the jurors. She explained that she had learned of Vento's unhappy connection with Cullen only after having been dismissed as an alternate juror. Mrs. Bewley denied that she was close to Cullen's side of the family or that she had been aware that Vento was the man accused of murdering Cullen.

On the basis of this testimony, and the fact that no other jurors, despite thirty to forty warnings to them by the judge, had reported any improper conversations, the court declined to permit an interrogation of the other jurors.

▮ If there is reason to believe that jurors have been exposed to prejudicial information, the trial judge is obliged to investigate the effect of that exposure on the outcome of the trial.[106] There is no obligation for the judge to conduct an investiga-

---

106. *United States v. Pomponio,* 517 F.2d 460 (4th Cir. 1975); *United States v. Doe,* 513 F.2d 709 (1st Cir. 1975); *United States v. Allison,* 481 F.2d 468, 470–73 (5th Cir. 1973), *cert. denied,* 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 759 (1974); *Paz v. United States,* 472 F.2d 740, 745–46 (5th Cir. 1970), *cert. denied sub nom. Jackson v. United States,* 414 U.S. 820, 94 S.Ct. 47, 38 L.Ed.2d 52 (1972). *See Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed.

tion, however, where no foundation has been established. Considering the evidence set forth above, there was no ground for Judge Green to believe that the jury had, in fact, been exposed to tainted information and, therefore, he did not abuse his discretion in refusing to permit the defendants to interrogate the other jurors.[107]

Defendants raise a collateral issue: the failure of Mrs. Bewley to reveal during the voir dire her familial relations to (1) a victim of crime and (2) a policeman. Such concealment can amount to a violation of due process of law.[108] There was no possible prejudice to any of the defendants here, however, since Mrs. Bewley did not discuss harmful materials with the other jurors, and did not participate in the deliberations.[109]

## SUFFICIENCY OF THE INDICTMENT

The nine counts in the superseding indictment alleged offenses under 21 U.S.C. §§ 846,[110] 841(a)(1),[111] and 843(b).[112] Each count included a reference to "methamphetamine, a Schedule II controlled substance . . .." Section 812 of the Drug Abuse Prevention and Control Act of 1970 enumerated the substances to be controlled and allocated them among five schedules. Section 811 provides for amendment of the section 812 schedule by the Attorney General, who is empowered to include additional substances or to transfer substances among the five schedules. On March 30, 1973, the Attorney General exercised this authority and shifted methamphetamine from schedule III, where it had been placed originally by Congress, to schedule II.[113]

Defendants maintain that a fatal variance between the terms of the statute and those of the indictment was created by the Attorney General's transfer of methamphetamine from schedule III to schedule II. The purpose of the schedules established in section 812, the defendants contend, is to define the crime and give notice to all that dealing in a particular substance constitutes a violation of law. To permit the Attorney General to add substances and to move them from one schedule to another, defendants argue, is to delegate the responsibility for the definition of crimes to the Attorney General.[114] The power to define a crime, however, is reserved to Congress alone and is thus incapable of delegation, according to the defendants. The defendants thus urge the Court to reverse their convictions which they assert are based on an unconstitutional modification of the law. In the alternative, the defendants seek a new trial in order to permit the jury to decide whether the government has proved all of the essential elements of the crime, namely, that methamphetamine is a schedule II controlled substance as charged in the indictment.

It is unnecessary to reach the issue posed by the defendants because the refer-

---

654 (1959); *Government of the Virgin Islands v. Gereau,* 502 F.2d 914, 934 (3d Cir. 1974).

**107.** *See United States v. Bujese,* 371 F.2d 120, 124–125 (3d Cir. 1969).

**108.** *United States ex rel. DeVita v. McCorkle,* 248 F.2d 1 (3d Cir.), *cert. denied,* 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957).

**109.** There is no indication in the record that Mrs. Bewley intentionally withheld this information about herself.

**110.** "Any person who attempts or conspires to commit any offense in this subchapter is punishable by imprisonment or fine or both . . .."

**111.** "(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, dis-

tribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

**112.** "It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter . . .."

**113.** 30 Fed.Reg. 8254 (March 30, 1973). *See* 21 CFR § 308.12 (1975).

**114.** Even if proper, this delegation is unconstitutional, say the appellants, because the guidelines supplied the Attorney General in the Act are impermissibly vague and overbroad.

ences in the indictment to the section 812 schedule are mere surplusage. Each count in the indictment—whether for conspiracy, use of an interstate communications facility, or possession—was framed in terms of a violation that rested upon section 841(a)(1), which prohibits dealing in "a controlled substance." Section 841(a)(1) is in no way confined in its scope to any particular schedule of controlled substances, so the crime charged in the indictment does not require more particular specification of the schedule.

No prejudice could befall the defendants from the surplusage in these indictments. Without reference to the schedule, the indictments complied with the requirements delineated by the Supreme Court in *Hamling v. United States*.[115] The indictments named methamphetamine as the controlled substance, and thereby sufficiently identified the crime, notifying the defendants of the charges against them and enabling them to avoid double jeopardy. The citation of the schedule was on no moment to the indictment.[116]

## CONCLUSION

There was no pattern in this prosecution of disregard by officials of Title III. The applications for the wiretaps were not invalid, the authorizations were not insufficient, and the executions of the interceptions were not improper. Asserted omissions by the Strike Force or by the district judge prove, upon examination, to be remediable and harmless; in no way were the defendants prejudiced. It was not error to admit the evidence from the physical search and the allegations of flaws at the trial are unsubstantiated.

This is not a case where, although each misstep appears excusable when considered by itself, error upon error acquires significance in cumulation.

The convictions will be affirmed.

---

**115.** 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). In *Hamling* the Court declared:

> . . . [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." "Undoubtedly the language of the statute may be used in the general description of an offense, but it must be accompa-

nied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.* at 117–18, 94 S.Ct. at 2907, 41 L.Ed.2d at 620 (citations omitted).

**116.** Moreover, because methamphetamine, whether regarded as a schedule II or a schedule III controlled substance, has always been a controlled substance under the Act, the defendants had no need to follow the Federal Register with close attention. There has always been notice, from the Congressional enactment itself, that dealing in methamphetamine is in violation of the law, and the defendants have not been prejudiced by the inclusion of methamphetamine in schedule II, rather than schedule III.