UNITED STATES of America, Appellee,

v.

Joseph Charles MILHOLLAN, a/k/a Alec Leroy Foltz, Appellant.

No. 78–1643.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Nov. 14, 1978.

Decided March 12, 1979.

## I

On September 22, 1977, a man entered the Security People's Trust Company in Girard, Pennsylvania, and cashed two money orders drawn on the Travelers Express Company, Inc., in the amount of two hundred dollars each. The man had presented identification in the name of John J. Leehy, Jr., the designated payee of the checks. Travelers later refused payment on the checks, which had been stolen.

The day after the incident in Girard, Milhollan aroused suspicions at the Warren National Bank in Warren, Pennsylvania, as he attempted to cash two Travelers' money orders made out to John J. Leehy, Jr. When a summoned police officer asked to see some identification, Milhollan fled on foot. He was apprehended a short distance from the bank. During the brief scuffle, a brown wig fell from Milhollan's head. The Warren police later conducted a warrantless search of Milhollan's automobile and discovered various items introduced at his trial on charges stemming out of the earlier incident in Girard. It is Milhollan's conviction on those charges that forms the basis of this appeal.

## II

Milhollan challenges several aspects of his conviction. He contends: (1) that the district court should have excluded testimony about various identifications made of him by employees of the bank in Girard; (2) that evidence of his activities in Warren should not have been admitted at his trial for the incident in Girard; (3) that evidence discovered in his automobile was inadmissible as the fruits of an illegal search; (4) that he was removed from state custody in violation of the Interstate Agreement on Detainers Act; and (5) that the sentencing judge improperly considered a prior conviction reversed on appeal.

### A.

At trial, three employees of the Security People's Trust Company identified Milhollan as the man who had presented the sto-

Blair A. Griffith, U. S. Atty., James J. West, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

George E. Schumacher, Federal Public Defender, Thomas S. White, Asst. Federal Public Defender, Pittsburgh, Pa., for appellant.

Before SEITZ, Chief Judge, and GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Joseph C. Milhollan appeals from his conviction on two counts of transporting stolen money orders in interstate commerce in violation of 18 U.S.C. § 2314.

len checks in Girard. Colleen Cochran, the teller who cashed the two checks, had sought approval from Douglas Nagle, a branch manager. Both Cochran and Nagle had observed the man for several minutes. Debbie Smalley, another teller, had observed the man for about one minute. Nagle was sufficiently suspicious to have Cochran record the license number of the man's car.

Within a few weeks of the incident, the Chief of Police in Girard showed Nagle a single black-and-white photograph of Milhollan taken upon his arrest in Warren. When the Chief of Police asked Nagle if he knew who it was, Nagle replied that the man looked familiar. Nagle further stated that the picture looked like the man who had passed the stolen checks, but that the man's hair had been different. The Chief of Police then confirmed that the man in the picture was a suspect. When the Chief of Police showed the picture to Smalley, she too thought it resembled the man sought for cashing the stolen checks. Although testimony conflicts, the Chief of Police apparently did not show the photograph to Cochran.

On October 25, 1977, Agent Kim Kelly of the Federal Bureau of Investigation showed Nagle, Smalley, and Cochran a photographic spread of eight persons, including the picture of Milhollan previously seen by Nagle and Smalley. Each of the three witnesses picked Milhollan's picture from the display; each commented on the difference in his hair.

On March 29, the FBI conducted a line-up for Nagle, Cochran, and Smalley. Milhollan appeared with four other men similar in height, weight, age, hair color, and eye color. The incident in Girard aside, the witnesses' only prior exposure to Milhollan had been the two photographic displays five months earlier. Nagle identified Milhollan as "awfully close" to the man in the bank, again noting the difference in hair style. Cochran selected another participant as having "much resemblance" to the man in the bank. Smalley initially identified no one in the line-up, but then said that she believed Milhollan to be the man who was in the bank.

The district court denied pretrial motions to suppress all identification testimony. At trial all three witnesses identified Milhollan in front of the jury. Cochran testified that she had chosen Milhollan's picture from the photographic spread shown to her by Agent Kelly. She admitted that she had chosen the wrong man at the line-up, but asserted that she was confused by the hair styles and that Milhollan was her second choice. Nagle testified that he had identified Milhollan on three prior occasions: when he was shown the single photograph, when he was shown the photographic spread, and when he viewed the line-up. Nagle admitted that his selection from the photographic spread may have been influenced by his prior exposure to Milhollan's picture, but he insisted that his initial identification of the photograph as well as his identifications at the line-up and in court were based on independent recollection. Smalley testified to her identification of Milhollan at the line-up. She too insisted that her identifications of Milhollan at the line-up and at trial were based on independent recollection and not on pictures she had seen.

Milhollan argues that the photographic identifications were so suggestive as to violate due process. Furthermore, he contends, those photographic incidents tainted the subsequent line-up and in-court identifications. We will consider the latter contention first.

All three witnesses testified to their participation in the line-up. All three also identified Milhollan in court. Such identifications are admissible, even in the face of earlier, tainted procedures, if the prosecution establishes by clear and convincing evidence that the later identifications were based upon independent observations of the defendant at the scene of the crime and not upon the earlier procedures. *See, e. g., United States ex rel. Carey v. Johnson,* 462 F.2d 592, 593 (3d Cir. 1972). The inquiry in the case of an out-of-court identification is whether the taint created "a very substantial likelihood of misidentifi-

cation." *See Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). For an in-court identification, we must determine whether the challenged procedures created "a very substantial likelihood of *irreparable* misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968) (emphasis added). '

■ Under these standards we agree with the district court that the line-up and the in-court identifications were sufficiently independent of the photographic displays to render them admissible regardless of the validity of those displays. All the witnesses had adequate opportunities to observe the man in the bank. When shown the photographs, all commented on the difference in hair style. More than five months elapsed between the second photographic display and the line-up. In the intervening months, the witnesses saw no pictures of Milhollan. Aside from their observations in Girard, none had ever confronted him in person before the line-up. Finally, all the witnesses testified at trial that they based their identifications of Milhollan on their view at the scene of the crime and not on any intervening events. Under these circumstances the district court did not err in allowing either testimony about the line-up or in-court identification of Milhollan. *See United States v. Higgins,* 458 F.2d 461, 465 (3d Cir. 1972).

Turning to the photographic displays, we note initially that Debbie Smalley never testified at trial to any identification of Milhollan prior to the line-up. Only Cochran and Nagle mentioned their prior photographic identifications. Cochran's testimony is similarly unassailable: the Chief of Police did not show her the lone photograph. Without this prior taint Milhollan has no basis for challenging her response to Agent Kelly's photographic spread.

■ Thus we must focus on Nagle's testimony. As noted earlier, he did testify that he had twice identified Milhollan from photographs. The first procedure, whereby the Chief of Police showed Nagle a single photograph, undoubtedly was suggestive. We must determine, however, whether it was so suggestive as to create a very substantial likelihood of misidentification. *See Neil v. Biggers, supra,* 409 U.S. at 198, 93 S.Ct. 375. In *Government of the Virgin Islands v. Petersen,* 553 F.2d 324, 327 (3d Cir. 1977), this court noted that an identification based on a single photograph, although suspect, may be admissible in some cases. We cited the frequent necessity for police to zero in quickly on a suspect in a crime. Furthermore, we noted that circumstances might indicate a substantial independent basis for the witness's identification.

■ In *Petersen,* the defendant was not at large at the time of the photographic display, but rather had been picked up for questioning. Similarly, in this case Milhollan was being held in Warren pursuant to his activities there. The police sought to establish a preliminary link between Milhollan and the incident in Girard. More importantly, Nagle, the most confident of the three identification witnesses, demonstrated a solid independent basis for his identification. He accurately described Milhollan as being about six feet tall, weighing 160 to 170 pounds, and having blue eyes. None of this data could have been determined from the black-and-white, chest-up photograph shown to Nagle by the Chief of Police. He also noted the difference in hair style when he saw the picture. We conclude that the initial photographic display did not, in Nagle's case, create a very substantial likelihood of misidentification. The district court did not err in allowing the jury to evaluate its credibility.

■ Agent Kelly's photographic spread, on the other hand, may not merit similar approbation. When Nagle viewed the second display he saw the same picture shown to him a short time earlier by the Chief of Police. By that time he also knew that the man in that picture was a suspect and was in custody. Nagle himself admitted that his choice in the second display may have been influenced by his prior exposure to Milhollan's picture. Under these circumstances, we find objectionable any

references at trial to Nagle's selection in the second display.

■ We need not find, however, that these references merit a new trial. Even if the display was unconstitutionally suggestive, testimony about the incident at trial was, at worst, harmless error. Nagle's direct testimony about the second display was brief and cumulative:

> Q. Now have there been any identification procedures that you have undergone?
>
> A. Yes. I've had three different occasions to identify the person involved.
>
> Q. Could you explain what those occasions were, sir?
>
> A. Yes. The first time the chief of police in Girard brought a photograph of the person involved into the bank, the second time the FBI showed us a photographic spread, and the third time was in a line-up situation here in Erie.
>
> Q. Have you always to your knowledge identified the same individual?
>
> A. I believe so, yeah.

Milhollan's trial counsel cross-examined Nagle on the second display, pointing out that Nagle had seen the picture earlier. At this time Nagle admitted that the earlier view may have influenced his choice in the second display.

Agent Kelly also testified about his photographic display. He noted initially that Colleen Cochran had chosen Milhollan from the spread. Turning briefly to Nagle's choice, Kelly continued:

> Q. Did he pick a photograph?
>
> A. Yes. The same—Mr. Milhollan's photo.
>
> Q. Mr. Milhollan's photo, okay. Were either one of those individuals aware of what the other one had done?
>
> A. No.
>
> Q. Or which photo the other one had picked?
>
> A. No.

Again, defense counsel cross-examined on the use of the same photograph.

We must view this testimony in its proper context. Nagle identified Milhollan in the first photographic display, at the line-up, and in court, all of which constituted admissible evidence. Cochran's identifications, all admissible, included a photographic display and an in-court identification. Smalley's identifications, also admissible, included a line-up and an in-court identification. Furthermore, and perhaps most significantly, Agent Kelly offered unrebutted testimony that Milhollan confessed that he was the person who had cashed the money orders in Girard. The admissible evidence of Milhollan's presence in Security People's Trust Company on September 22, 1977, dwarfed references to Nagle's choice at the second photographic display. We conclude that any constitutional error resulting from these references was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See also Moore v. Illinois*, 434 U.S. 220, 232, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977).

### B.

■ Milhollan contends that the district court erred in admitting testimony about his attempt to cash money orders in Warren, Pennsylvania. In particular, he alleges that this evidence was inadmissible under Federal Rules of Evidence 403 and 404(b).

Rule 404(b) generally precludes admitting evidence of other crimes or wrongful acts "to prove the character of a person in order to show that he acted in conformity therewith." Such evidence may be admissible, however, "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." We note in particular the permission to use such evidence to prove identity.

Here, the identity of the individual in Girard was the most important factual issue in the case. Milhollan had been apprehended in Warren the very next day while attempting to pass money orders identical in amount, payee, and payor to those passed in Girard. The numbers of the Warren checks followed sequentially from

those cashed in Girard. In Warren, Milhollan carried the driver's license shown to Nagle in Girard. All this evidence is highly probative of Milhollan's identity as the man who cashed the money orders in Girard.

Milhollan focuses on the testimony concerning his attempt to flee from the bank in Warren. He argues that this evidence, in particular, is highly prejudicial and is irrelevant to identity. The district court, however, received testimony on the events in Warren as a whole. We cannot conclude that it erred in failing to excise this portion of the testimony, especially in light of the trial court's instructions cautioning the jury on the proper use of this evidence. Furthermore, we note that Milhollan's flight revealed his use of a wig, an important fact buttressing the identifications made by Nagle, Cochran, and Smalley.

Milhollan also contends that the district court erred in failing to perform, on the record, the balancing required by Rule 403. That Rule offers a catchall exception to admissibility where the evidence, although relevant, is so unfairly prejudicial as to outweigh its probative value. At no time, however did defense counsel mention Rule 403 to the district court. In *United States v. Long*, 574 F.2d 761, 766 (3d Cir. 1978), we held that a defendant must specifically invoke Rule 403 if he wants the district court to perform the requisite analysis on the record. "[W]here Rule 403 is not invoked, the trial judge's balancing will be subsumed in his ruling." *Id.* Here, as in *Long*, we recognize the "highly subjective factors" that undergird a decision to admit evidence, *id.* at 767, and find no abuse of discretion. In this case the district court did not err in admitting evidence concerning the events in Warren.

#### C.

Milhollan claims that the police in Warren illegally searched his automobile after his arrest, and that the district court should have suppressed the fruits of that search.

A teller at the Warren National Bank alerted police to Milhollan's attempt to cash suspicious money orders. Officer Norman Shattuck approached Milhollan and asked him if he had any identification. Milhollan replied that he had left his identification in his car. Almost immediately, he began to run in the direction of a public parking lot a few blocks away. Shattuck apprehended Milhollan after a brief chase, at which time a wig fell from Milhollan's head. When Officer James Leichtenberger arrived at the scene he transported Milhollan to the police station. Meanwhile, Shattuck returned to the bank and recovered the money orders that Milhollan had attempted to cash, both payable to John J. Leehy, Jr.

At the station the police searched Milhollan and discovered that he was carrying a driver's license and a social security card in the name of John J. Leehy, Jr., as well as a set of car keys with a dealer's tag marked "Gold Capri." Leichtenberger returned to the area where Milhollan had been apprehended and found a gold Capri parked in the public lot. Looking through the window of the car, Leichtenberger saw on the front passenger's seat a police-scanner radio, a book of police call numbers, and a map of Pennsylvania. In the back seat he saw a blue satchel. Leichtenberger then radioed his sergeant and asked him to come to the scene. While he was waiting, he tried one of Milhollan's keys in the door of the car and found that it fit.

When Sergeant Uruy arrived at the lot, he instructed Leichtenberger to drive the car to the police station, impound it, and search it. This search revealed a temporary registration card for the car, a wallet bearing identification for one Alec L. Foltz wrapped in a rag, and a loaded pistol. The satchel, which apparently had been closed but not locked, contained $2,400 in cash and twenty-two Traveler's money orders payable to John J. Leehy, Jr., in the amount of $200 each. Everything found in the car, except the pistol, was admitted at Milhollan's trial.

Milhollan contends that the warrantless search of his car was illegal. Furthermore, he argues that the search of the satchel was illegal regardless of the legality of the intrusion into his car. We reject both of these contentions.

■ The police may conduct a warrantless search of an automobile whenever two factors are present. First, the police must have probable cause to believe that the automobile contains articles subject to seizure, including evidence of a crime. Second, the justification for the search must arise suddenly and unexpectedly. *United States v. Vento,* 533 F.2d 838, 866 (3d Cir. 1976). *See also Chambers v. Maroney,* 399 U.S. 42, 47, 49–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Once these conditions are fulfilled, the police are free to search the car immediately or to seize the car and search it at the station house. Either of these courses of action is constitutionally permissible. *See Chambers v. Maroney, supra,* at 52, 90 S.Ct. 1975, 26 L.Ed.2d 419; *United States v. Vento, supra,* at 866.

■ Here, the police had probable cause to believe that Milhollan's automobile contained evidence of an attempt to pass stolen or forged money orders. The bank was wary of the money orders from the beginning of the transaction. When Officer Shattuck asked Milhollan for identification, Milhollan responded that he had left it in his car. Actually, as the police discovered immediately after his arrest, Milhollan was carrying identification on his person, identification corresponding to the designated payee of the money orders. Combining these facts with Milhollan's flight and with his use of a wig, the police reasonably could conclude that Milhollan was not John J. Leehy, Jr. Furthermore, given Milhollan's initial reference to his car and the direction of his flight, the police had probable cause to believe that evidence in his car would disclose Milhollan's real identity. Such evidence, of course, would be highly relevant to Milhollan's detention and ultimate prosecution on charges of cashing stolen or forged money orders.

■ Nor can Milhollan argue that this probable cause did not arise suddenly and unexpectedly. *See United States v. Vento, supra,* at 866–67. As in *Vento,* events surrounding the arrest itself triggered the suspicion that the automobile contained evidence. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), where the police knew for some time about the role of the automobile in the crime, is distinguishable. As we noted in *Vento, Coolidge* does not control "where the occasion to search the vehicle arises suddenly." *United States v. Vento, supra,* at 866. When such probable cause suddenly crops up, the police need not freeze the situation while they secure a search warrant for the automobile. They may search the car immediately or seize it and search it later. *See id.; Chambers v. Maroney, supra,* 399 U.S. at 53, 90 S.Ct. 1975. Applying these standards we conclude that the search of Milhollan's automobile was legitimate.

■ Milhollan contends that the warrantless search of the satchel found in his car was illegal regardless of the status of the initial intrusion into his automobile. He places primary reliance upon *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). There, federal agents had probable cause to believe that a trunk contained drugs as it was being moved through a train station. Nevertheless, the agents did not seize the trunk until just after it had been loaded into the back of an automobile. The agents then took the trunk to their headquarters where they conducted a warrantless search. The Supreme Court held that this search was unreasonable in the absence of a warrant, despite the mobility of luggage.

Before *Chadwick,* the federal courts of appeals generally agreed that police entitled to search an automobile under *Chambers* could also search briefcases and footlockers carried in that automobile. *See United States v. Tramunti,* 513 F.2d 1087, 1104–05 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Issod,* 508 F.2d 990, 993 (7th Cir. 1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975); *United States v. Soriano,* 497 F.2d 147 (5th Cir. 1974) (en banc), *convictions summarily affirmed sub nom. United States v. Aviles,* 535 F.2d 658 (5th Cir. 1976), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); *United States v. Evans,* 481 F.2d 990, 993–94 (9th Cir. 1973).

Since *Chadwick*, however, some courts have expressed hesitation about permitting police to conduct such searches, especially where the suitcase or trunk itself, rather than the automobile carrying it, is the target of the search from the start of the investigation. *See United States v. Stevie,* 582 F.2d 1175 (8th Cir. 1978) (en banc); *United States v. Fontecha,* 576 F.2d 601, 603–06 (5th Cir. 1978) (dictum); *Arkansas v. Sanders,* 262 Ark. 595, 559 S.W.2d 704 (1977), *cert. granted,* 439 U.S. 891, 99 S.Ct. 247, 58 L.Ed.2d 236 (1978).

We do not believe, however, that *Chadwick* controls here, since the Supreme Court itself did not treat that case as one involving an automobile search. The government had not asserted that the footlocker's "brief contact with Chadwick's car" justified the intrusion under *Chambers v. Maroney* and its progeny. *See* 433 U.S. at 11, 97 S.Ct. 2476. Nor did the Court suggest that it was altering in any way the rules governing pure automotive searches. *See Rakas v. Illinois,* 439 U.S. 128, 148, 152, 99 S.Ct. 421, 433, 435, 58 L.Ed.2d 387 (1978) (Rehnquist, J., for the Court and Powell, J., concurring); *United States v. Finnegan,* 568 F.2d 637, 640–41 (9th Cir. 1977) (reaffirming *United States v. Evans, supra,* after *Chadwick*). Here, the police had probable cause to believe that Milhollan's car, not a particular container in brief contact with Milhollan's car, contained evidence of a crime. Their suspicions were not localized; their search of the automobile was not a pretext for a search of the satchel. They only knew that somewhere in Milhollan's automobile there probably was evidence shedding light on his true identity. These facts bring this case within *Chambers* and distinguish it from *Chadwick.*

▆▆▆ Milhollan would have the police secure a search warrant permitting them to open closed containers like his satchel. Unfortunately, once the satchel is removed from the context of an automotive search, the police may not have probable cause to support a warrant. They had no inkling that the satchel, by itself, contained relevant evidence. They only knew that the

car contained evidence and that the satchel was in the car. Permission to search an automobile is hollow indeed if it does not include permission to search its contents and component parts. We see no difference of constitutional magnitude between unwrapping the rag surrounding Alec Foltz's wallet and opening the satchel lying on the back seat.

We hold that this automotive search, justifiable under *Chambers v. Maroney* and *United States v. Vento,* legally could include a search of Milhollan's satchel because the satchel's contact with the automobile was more than incidental and because the intrusion into the automobile was not a pretext for a search of the satchel. The district court did not err in refusing to suppress the fruits of that search.

### D.

While Milhollan was being held by Warren County authorities the federal government lodged a detainer against him. Soon thereafter, using a writ of habeas corpus ad prosequendum, the government took custody of him long enough to arraign him on the present charges. They then returned him to state custody. Later, Milhollan presented the district court with a letter from the Department of Corrections of the State of Michigan asserting that Milhollan had escaped from custody in that state and that he would receive credit on his sentence for the time he was incarcerated in Pennsylvania. Milhollan argues that these facts entitle him to the protection of Article IV(e) of the Interstate Agreement on Detainers Act (IAD), 18 U.S.C.App. pp. 1395–96 (1976). If the agreement does apply to Milhollan, the government's failure to prosecute him before returning him to state custody might dictate dismissing the federal indictment lodged against him. *See United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).

In 1970 the federal government became a party to the IAD. This agreement governs the transfer of prisoners incarcerated in one jurisdiction, the "sending state," to another jurisdiction, the "receiving state," for trial

on charges pending in the receiving jurisdiction. Although the IAD was intended to cure a number of ills, Article IV(e) was intended to insure that the transferred prisoner would be tried on the pending charges before being returned to the sending state.

 Courts consistently have held that the IAD applies only to convicted prisoners and not to pretrial detainees. *See United States v. Harris,* 566 F.2d 610, 613 (8th Cir. 1977); *United States v. Roberts,* 548 F.2d 665, 669 (6th Cir.), *cert. denied,* 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977); *United States v. Boyd,* 437 F.Supp. 519, 520 (W.D.Pa.1977). *See also United States v. Dobson,* 585 F.2d 55, 58 (3d Cir. 1978) (dictum). Thus Milhollan's detention in Pennsylvania, by itself, did not trigger the agreement. Nevertheless, Article IV purports to apply to any "prisoner" who is "serving a term of imprisonment in any party State . . .[,]" a phrase that might include Milhollan's post-arrest arrangement with the State of Michigan. Article IV also requires the receiving state to file a demand with the state where the prisoner is incarcerated, obviously Pennsylvania in this case. Neither Article IV nor the IAD as a whole expressly requires the incarcerating, or sending, state to be the same as the state where the prisoner is "serving a term of imprisonment." Thus, nothing in the agreement itself precludes the interpretation sought by Milhollan.

Nevertheless, such a reading of the IAD would create a number of anomalies. First, as Milhollan's case demonstrates, the receiving state cannot determine a prisoner's status in any state except that in which he is being held. Milhollan would have us dismiss his indictment even though he did not reveal his status in Michigan until one month after his arraignment and return to Pennsylvania's custody. Nor would any pre-trial detainee have incentive to reveal his status in another state if the government's failure to discover that status could render the indictment invalid.

Furthermore, Milhollan's reading of Article IV(e) would not serve that provision's underlying policy, identified by this court in *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 836–37 (3d Cir. 1975). In that case we noted that Article IV(e) was intended "to minimize the adverse impact of a foreign prosecution on rehabilitative programs of the confining jurisdiction." As a pre-trial detainee, Milhollan had little interest in Pennsylvania's rehabilitative programs. As an escaped convict, Milhollan had no interest whatsoever in Michigan's rehabilitative programs.

Given these considerations, we reject Milhollan's reading of Article IV(e) and hold that he was not entitled to the protection of the Interstate Agreement on Detainers.

### E.

Finally, Milhollan contends that the sentencing judge did not consider that one of Milhollan's prior convictions had been reversed on appeal. The record shows, however, that the district court expressly disregarded that conviction in sentencing Milhollan.

### III

After considering each of Milhollan's contentions we conclude that none of them merit reversal. The judgment and sentence of the district court will be affirmed.

GIBBONS, Circuit Judge, dissenting:

On September 22, 1977, a man later identified as Joseph Charles Milhollan entered the Girard Branch of the People's Trust Company and cashed two money orders, each in the amount of two hundred dollars. He produced identification in the name of the payee, John J. Leehy, Jr., and received payment on the money orders. On the following day, Milhollan entered the Warren National Bank, Warren, Pennsylvania, and attempted once again to cash two money orders payable to John Leehy, Jr. On this occasion, bank officials became suspicious, and alerted the police. Officer Norman Shattuck arrived at the bank, approached Milhollan, and asked him for some identification. Milhollan claimed that he had left his identification in his car. Suddenly he

fled, initially running north, then retracing his steps southward. After a short pursuit, Officer Shattuck apprehended Milhollan, whose wig had fallen off during the chase. He was immediately arrested and transported to the police station by James Leichtenberger, an officer who had arrived on the scene.

A station house search of Milhollan revealed a wallet containing identification in the name of John Leehy, Jr. In addition, the police uncovered a car key on a tag marked "Gold Capri." Officer Leichtenberger took the car key, and went off in search of a gold Capri which he hoped to find parked somewhere in the vicinity of Milhollan's arrest. The officer finally found a gold Capri in a municipal parking lot approximately one hundred yards from where Milhollan was arrested. Inside the car, Leichtenberger noticed a police scanner, a book of police call numbers, a map of Pennsylvania and a blue satchel. Leichtenberger radioed another officer, and, while awaiting his arrival, tried the key taken from Milhollan and discovered that it opened the two locked doors of the Capri.

On the instructions of Sergeant Uruy—the officer summoned to the scene—Leichtenberger drove the car to the police station, impounded it, and effected a warrantless search of its contents. That search uncovered a temporary registration card for the car, a wallet wrapped in a rag and containing identification of an Alec L. Foltz, an automatic pistol, and a blue satchel. The police then opened the satchel and discovered $2400 in cash as well as twenty-two money orders, each in the amount of $200 and made payable to John Leehy, Jr.

Milhollan was charged under a two count indictment for causing forged and falsely made money orders to travel in interstate commerce in violation of 18 U.S.C. § 2314. At trial, he sought to suppress the evidence seized during the warrantless search of his car, claiming that the search violated his rights under the fourth amendment. The trial court rejected his contentions, and Milhollan was duly convicted on both counts.

On appeal Milhollan contends that the warrantless search and seizure of the contents of the blue satchel violated his fourth amendment rights defined in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Moreover, he argues that the initial warrantless search of the automobile transgressed the Supreme Court's holdings in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In a perfunctory opinion, the majority rejects both contentions. It does so, in large part, by construing the Supreme Court's decisions metaphorically, rather than recognizing in them a consistent effort to preserve, where possible, the safeguards inherent in the Warrant Clause of the fourth amendment. Because I do not share the majority's apparent discomfort with the constitutional protections offered by the fourth amendment, I respectfully dissent.

## I. THE SEARCH OF THE SATCHEL

Milhollan contends that the police search of the blue satchel, which was closed and placed inside the automobile, violated his constitutionally protected expectation of privacy. Accordingly, he reasons, the trial court should not have permitted the $2400 and twenty-two money orders to be introduced as evidence. The majority rejects this argument, reasoning that any justification for searching Milhollan's car must, in the absence of pretext, also apply to the search of any of the contents of the car. Since, in the majority's estimation, the initial automotive search was justifiable,[1] and, moreover, since "the satchel's contact with the automobile was more than incidental and . . . the intrusion into the automobile . . . not a pretext for a search of the satchel," Opinion, *post* at 527, the search of the satchel was permissible.

I confess at the outset that there is some support for the majority's position. Justice Blackmun, in *United States v. Chadwick, supra*, 433 U.S. at 23 n.4, 97 S.Ct. at 2489,

1. *But see infra* at 531–533.

**530**

n.4, argued that "[t]he scope of the 'automobile search' exception to the warrant requirement extends to the contents of locked compartments, including glove compartments and trunks. . . . The Courts of Appeals have construed this doctrine to include briefcases, suitcases, and footlockers inside automobiles." Justice Blackmun's opinion embraced a "transfer theory" for evaluating intrusions into closed luggage. That theory, which is indistinguishable from the majority's, essentially asserts that any justification to search a car is necessarily transferred even to closed items within it.

The catch, of course, is that Justice Blackmun's opinion in *Chadwick* was a dissent. The *Chadwick* majority, on the other hand, resoundingly rejected the broad exception to the Warrant Clause urged by Justice Blackmun. In *Chadwick*, itself, the defendants were arrested outside a Boston train station after having loaded a locked footlocker into an automobile trunk. The defendants and the unopened footlocker were transported to the federal building where federal officers effected a warrantless search of the footlocker. In so doing, they uncovered a large quantity of marijuana. The court of appeals sustained defendants' suppression motion and the Supreme Court affirmed, holding that the search violated defendants' rights under the Warrant Clause of the fourth amendment.

Writing for the majority, Chief Justice Burger observed, first, that

this Court has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts.

433 U.S. at 12, 97 S.Ct. at 2484. Specifically, he noted, automobiles have an "inherent mobility, which often makes obtaining a judicial warrant impracticable." *Id.* Moreover, a "diminished expectation of privacy . . . surrounds the automobile." *Id.* A car " 'travels public thoroughfares where both its occupants and its contents are in plain view.' " *Id.* (quoting *Cardwell v.*

*Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion)). "Luggage contents," on the other hand,

are not open to public view, . . . nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects.

*Id.* at 13, 97 S.Ct. at 2484. In addition, the Court reasoned, the footlocker's mobility does not justify "dispensing with the added protections of the Warrant Clause." *Id.*

Once the federal agents had seized it at the railroad station and had safely transferred it to the Boston Federal Building under their exclusive control, there was not the slightest danger that the footlocker or its contents could have been removed before a valid search warrant could be obtained. The initial seizure and detention of the footlocker, the validity of which respondents do not contest, were sufficient to guard against any risk that evidence might be lost. With the footlocker safely immobilized, it was unreasonable to undertake the additional and greater intrusion of a search without a warrant.

*Id.* (footnotes omitted). Thus, the Court concluded, there were no "exigent circumstances" sufficient to override the defendants' privacy interest in the contents of the footlocker.

In the instant case, as in *Chadwick*, the contents of the blue satchel possessed all of the features of privacy elaborated by the Chief Justice. Moreover, with Milhollan safely in custody, the only known key to the Capri in police possession, and no known confederates at large, there was not the slightest risk of the satchel's removal. Thus the essential features in *Chadwick*—a greater privacy interest and a lower mobility, or lack of exigency—were firmly established.

Yet the majority purports to distinguish *Chadwick* by pointing to the merely "brief contact" that the footlocker in *Chadwick* had with the defendants' car. It urges

that, because of this "incidental" contact, the search in *Chadwick* cannot be construed as an *automotive search*, but rather must be seen as a separate *search of luggage*, a search which the government tried to justify by relying on a novel exception to the Warrant Clause derived, by analogy, from the "automobile exception." Insofar as *Chadwick* simply refused to *extend* the automobile exception in that fashion, the majority surmises that it did not affect the legality of searches of items which are more than incidentally related to an automobile. Hence, the majority concludes, the instant search of the blue satchel, which transpired as part of an actual automotive search, is not governed by the ostensibly limited decision of the Court in *Chadwick*. But surely this is a distinction without a difference. The broad policies of privacy and immobility, in terms of which the *Chadwick* Court generally distinguished luggage from automobiles, apply to luggage of any sort, not simply that which has an "incidental" relationship to an automobile. The distinction, for constitutional purposes, between the contents of two satchels, one which was *just placed* in a car and the other which was *already there*, is one I find altogether chimerical. The *Chadwick* Court, I suggest, would be no less mystified.[2] The same holds true for most of the courts of appeals which have expressly considered this issue.[3]

The majority is apparently uncomfortable with the distinctions drawn by the Supreme Court between automobiles and luggage. Thus, it chooses, despite the Court's explicit direction to the contrary, to import the rationale for automobile searches into a domain where it simply does not fit. This effort at legal gymnastics is attempted so that, in the majority's words, "[p]ermission to search an automobile" is not rendered

"hollow indeed. . . ." Opinion, *ante* at 527. But regardless of the majority's desire to assist in law enforcement, it efforts to square a doctrinal circle—particularly given the doubtful validity of the "permission" to effect the initial search of the car[4]—is unjustifiable.

## II. THE SEARCH OF THE AUTOMOBILE

As noted above, the majority's purported justification for the search of the satchel derives from its view that the initial search of the car was proper. That initial search, besides turning up the critical evidence found in the satchel, also uncovered other items subsequently introduced in evidence against Milhollan. The majority upholds this search, relying on the Supreme Court's decision in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and the decision of this court in *United States v. Vento*, 533 F.2d 838 (3d Cir. 1976). It misreads those decisions.

In *Chambers*, petitioner was arrested after an automobile in which he was riding was stopped by the police. The automobile was driven to the police station where a thorough search of the car revealed certain incriminating evidence. Petitioner challenged this search on fourth amendment grounds and the Supreme Court upheld its constitutionality. Writing for the majority, Justice White indicated, first, that "probable cause" is "a minimum requirement for a reasonable search permitted by the Constitution." 399 U.S. at 51, 90 S.Ct. at 1981. Moreover, he noted, the fourth amendment has "[a]s a general rule, . . . also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made." *Id.*

---

**2.** Thus, for example, in his concurrence in *Chadwick, Justice Brennan expressly rejected the "transfer theory" endorsed by Justice Blackmun in his Chadwick dissent and by the majority today.*

While the contents of the car could have been searched pursuant to the automobile exception, it is by no means clear that the contents of locked containers found inside a car are subject to search under this excep-

tion, any more than they would be if the police found them in any other place.
433 U.S. at 17 n.1, 97 S.Ct. at 2486 n.1.

**3.** *See, e. g., United States v. Stevie*, 582 F.2d 1175 (8th Cir. 1978) (en banc); *United States v. Fontecha*, 576 F.2d 601 (5th Cir. 1978) (dicta). *But see United States v. Finnegan*, 568 F.2d 637 (9th Cir. 1977).

**4.** *See infra* at 531–533.

That warrant requirement, White continued, may only be suspended "in exigent circumstances." *Id.*

In the instant case, the majority fails to establish that either one of these two prerequisites for a warrantless search has been satisfied. As evidence of probable cause, the majority cites: the bank's suspicions of Milhollan; appellant's response to Officer Shattuck, claiming to have left his identification in the car; appellant's flight, ostensibly in the direction of his car; and appellant's use of a wig. Plainly, the bank's suspicions have little, if anything, to do with the issue; indeed, they would hardly suffice as probable cause for Milhollan's *arrest*, let alone for a search of his car. Similarly, appellant's use of a wig at best supports the validity of his *arrest*. It says nothing at all about what might or might not be in his car.[5] The same is true of Milhollan's claim to have left his identification in the car. Indeed by the time the car was searched, the police knew that the identification as John Leehy, the name used at the bank, was in Milhollan's personal possession, not in the car. Finally, the majority's reliance on Milhollan's flight as evidence of probable cause for the search is also misplaced. The evidence adduced at the suppression hearing indicates that Milhollan ran in at least two directions and, when apprehended, was approximately one hundred yards from his car and about as close to the bank as he was to the parking lot. N.T., Vol. 2, 169–70 (testimony of Officer Shattuck); 153–54 (testimony of Officer Leichtenberger). From this rather ambiguous data, the trial court found that Milhollan was "running towards the car. . . ." *Id.* at 180. Significantly, the court added that this evidence "leads to the inference he was trying to get away through the use of his car. . . ." *Id.* From this inference, however, the trial court's conclusion that there was therefore probable cause to search the car does not follow. Unquestionably, the first instinct of virtually any pursued suspect would be to escape, preferably by means of an automobile if one is available. The trial court so found. That instinct toward escape, however, implies nothing at all about the *contents* of the car, except, perhaps, that there is gasoline in the tank.[6]

If the majority's attempt to establish the basis for probable cause emerges as inadequate, so too does its labored effort to find the exigent circumstances necessary to justify the circumvention of the warrant requirement. Neither *Chambers,* nor *Vento* supports that circumvention. In *Chambers,* Justice White held simply that where a suspect is arrested under circumstances which render his automobile a "fleeting target," 399 U.S. at 52, 90 S.Ct. 1975, the Constitution does not forbid the police from effecting a search of the car, even after it has been brought down to the station house. Similarly, in *Vento,* this court observed that there were specific exigent circumstances that required the warrantless search: the car was stopped on a public street and was

---

**5.** *See Dyke v. Taylor Implement Co.,* 391 U.S. 216, 221, 88 S.Ct. 1472, 1475, 20 L.Ed.2d 538 (1968) ("The cases . . . have . . . always insisted that the officers conducting the search have 'reasonable or probable cause' to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search").

**6.** The majority implies in passing that Milhollan's possession of a police scanner and a book of police call numbers somehow adds a further basis for the search of the car. Opinion, *ante* at 526. I need only note that the testimony of Officer Leichtenberger effectively disposes of this contention.

 Q. And when you looked into the automobile while it was in the lot, you saw the scanner?
 A. Yes.
 Q. Now is there anything illegal in having a scanner?
 A. No.
 Q. Is this, from your familiarity with scanners, kind of like the CB radios, where a lot of people like to listen to police cars and therefore you have scanners?
 A. Yes.
 Q. And in order to operate a scanner, isn't it standard operating procedure to have the book that shows how to find the police calls?
 A. When you buy one, they usually supply one.

N.T., Vol. 2, 155 (testimony of Officer Leichtenberger). The scanner and book of call numbers are, in short, common hobbyist's items.

"easily accessible to confederates." 533 F.2d at 866–67. Indeed, the *Vento* court pointed to specific co-conspirators who might have otherwise been able to tamper with the contents of the automobile in question. *Id.* at 867. In the instant case, however, none of these exigencies exists. Milhollan was never within one hundred yards of his car during the entire time of the police's intervention. Indeed, at the moment of the search, appellant was safely tucked away in police custody. Moreover, the government has never alleged that there were any co-conspirators who might have had access to the Capri.

This case, insofar as the search of the car is involved, falls within the ambit of the Supreme Court's decision in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). There, petitioner was arrested, and his car impounded and taken to the police station. Two days later, a warrantless search [7] was effected and incriminating evidence uncovered. Petitioner objected to the search and the Supreme Court, in a plurality opinion, reversed. Exceptions to the Warrant Clause, Justice Stewart observed, must be " 'jealously and carefully drawn,' [quoting *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958)] and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative' " (quoting *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948)). 403 U.S. at 455, 91 S.Ct. at 2032. The burden to establish the need for an exception is placed on those who seek its favor. *Id.* Stewart distinguished *Chambers*, emphasizing that in that case the automobile was *"stopped on the highway*," *id.* at 460, 91 S.Ct. at 2035 (*emphasis in the original*), and thus there were exigent circumstances that justified the subsequent station-house search. In *Coolidge*, on the other hand, neither the

defendant nor his family "could conceivably have gained access to the automobile after the police arrived . . . ." *Id.* The merely hypothetical possibility that "[a] person who had the keys . . . could slip by the guard . . . [and] drive it away" was regarded as of "no constitutional significance. . . ." *Id.* at 461 n.18, 91 S.Ct. at 2035 n.18.

Like the petitioner in *Coolidge*, Milhollan was in no position to tamper with the contents of the automobile. The police had him in custody and had possession of the automobile key. The majority reasons, however, that where the probable cause to search "arises suddenly," no warrant need be obtained. Once again, however, this reasoning misconstrues the case law. The *Vento* court, from which the majority borrows the phrase "arises suddenly," used those words simply to contrast the facts before it with those in *Coolidge*. 533 F.2d at 866. It held that since the police in *Vento* could not be said to have delayed the search until such time as no longer to have a justification of exigency, the *Coolidge* situation was not presented. Significantly, however, the *Vento* court specifically insisted that exigent circumstances be present. Thus, as I have noted, the exigency requirement was satisfied in *Vento* by the potential accessibility of the car to the defendant's known confederates. *Id.* at 866–67. By effectively abandoning the exigency requirement, the majority today dilutes whatever vitality the Warrant Clause may otherwise have had.

\* \* \* \* \* \*

Eight years ago, in *Coolidge v. New Hampshire, supra,* Justice Stewart reminded us that "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." 403 U.S. at 461–62, 91 S.Ct. at 2052. Today, the majority brings us an important step closer to the renunciation of that reminder.

---

7. The search of petitioner's car in *Coolidge* was actually effected pursuant to a warrant issued by the State Attorney General who was acting, pursuant to a New Hampshire statute, as a justice of the peace. The Supreme Court found that the Attorney General is not a "neutral and detached magistrate required by the Constitution. . . ." *403 U.S. at 453, 91 S.Ct. at 2031.* Thus, it held, "the search stands on no firmer ground than if there had been no warrant at all." *Id.*

534

It substantially exaggerates the basis for probable cause, assumes, *ex nihilo*, the exigent circumstances necessary to circumvent the Warrant Clause and, finally, transfers those fanciful justifications to the search of a closed satchel located within the car. Because I cannot indulge such fictions, I would order a new trial.